2020 IL App (2d) 200052-U
No. 2-20-0052
Order filed December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-627 |
| AHMED TAWFEEQ, | ) ) ) | Honorable Robert A. Wilbrandt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was proved guilty beyond a reasonable doubt of all counts, and defendant's counsel was not ineffective where defendant was unable to demonstrate prejudice. Defendant's aggregate sentence was not excessive.  Affirmed.

¶ 2    Following a bench trial, defendant, Ahmed Tawfeeq, was convicted of attempted aggravated criminal sexual assault (720 ILCS 5/11-1.30(4) (West 2016)), attempted criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2016)), criminal sexual abuse (720 ILCS 5/11-1.50(a)(1), aggravated battery (720 ILCS 5/12-4(b)(8) (West 2016)), unlawful restraint (720 ILCS 5/10-3(a) (West

2016)), and promoting prostitution (720 ILCS 5/11-14.3 (West 2016)). On appeal, defendant makes three arguments: First, defendant argues (1) that the evidence was insufficient to prove his guilt beyond a reasonable doubt; (2) that trial counsel provided ineffective assistance; and (3) that his five-year concurrent sentence resulting from his convictions was excessive.[1] We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In July 2017, the McHenry County grand jury returned an indictment charging defendant with seven separate counts stemming from an Uber trip that took place during June 16, 2017. Specifically, count 1 alleged that defendant committed attempted aggravated criminal sexual assault (720 ILCS 5/11-1.30(4) (West 2016)), count 2 alleged that defendant committed attempted criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), count 3 alleged that defendant committed aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2016)), count 4 alleged that defendant committed criminal sexual abuse (720 ILCS 5/11-1.50(a)(1), count 5 alleged that defendant committed aggravated battery (720 ILCS 5/12-4(b)(8) (West 2016)), count 6 alleged that defendant committed unlawful restraint (720 ILCS 5/10-3(a) (West 2016)), and count 7 alleged that defendant promoted prostitution (720 ILCS 5/11-14.3 (West 2016)).

¶ 5                                    A. Bench Trial

¶ 6      On November 4, 2019, defendant's bench trial commenced. Gabriela Mendez testified that, on the morning of June 16, 2017,[2] she had just finished her shift as a security officer for the Grand Victoria Casino (casino) when a coworker dropped her off at her parents' house. Mendez then used

_____

[1] Defendant does not argue that his sentence for any one count is excessive in of itself. Instead, he suggests that "[t]he sentences imposed on [defendant] effectively resulted in a sentence of five years imprisonment," and that the resulting aggregate sentence was excessive.

[2] Certain portions of the trial transcript incorrectly list this date as June 6, 2017.

Uber—a phone application that provides ride-sharing services—to request a car ride to her Crystal Lake residence. The Uber application notified Mendez that defendant would drive her to her destination. Once defendant arrived, Mendez got into his car and the two left. During the drive, the two spoke about their work: Mendez told defendant that she worked security at the casino and Defendant mentioned that aside from driving for Uber, he also owned several businesses.

¶ 7    As they continued their drive, defendant told Mendez that "there's ways to make money" and that she should "fuck for money." Mendez testified that she felt uncomfortable and told defendant, "[N]o, I'm okay with what I do." Defendant asked Mendez how much money she made at the casino, and after Mendez answered, defendant continued to press her about prostituting herself. Defendant told her "that he could help [her] get guys" and mentioned websites that Mendez could use to solicit clients.

¶ 8    Mendez noticed that when they were still about five minutes away from her home, defendant used the Uber app to prematurely report that her trip had ended. Defendant parked in a visitor's parking lot near Mendez's home. When Mendez told defendant that she lived further down the street, defendant abruptly took his seatbelt off, grabbed Mendez, and started kissing her. He put his hand down Mendez's shirt and began fondling and kissing her breasts.

¶ 9    After Mendez tried to push away from defendant, he unzipped his pants and exposed his penis to her. She told him that she was "not going to do anything," and defendant replied, "[C]ome on, come on, just, you know, put your mouth on it." He grabbed her head and bent it towards his penis. Mendez asked to be taken home. Defendant then told Mendez to "just grab it" before taking her hand and pulling it towards his penis. Mendez pulled her hand back and refused.

¶ 10    Defendant then asked for Mendez's phone number so that he could "get in contact and send [her] people," presumably in reference to defendant's earlier suggestions of prostitution. He told

her "not to give him the wrong number, that this was serious." Mendez gave him her phone number because she was very scared, feared defendant may have had a gun, and "felt like [she] had to give him the right number in case he dialed back to make sure it was mine." Defendant then pulled out of the visitor's lot and into a neighbor's driveway. As she got out of his car, defendant told Mendez "not to be shy at the casino." Mendez believe defendant made this comment because he intended to "go to [her] job."

¶ 11    Mendez testified that she was shocked once she made it back inside her home. She testified that she told her roommate, Rosa Acevedo, about what had happened the next morning. Acevedo called the police and Detective Michael Freese initially responded. On June 19, 2017, Mendez visited the police department to give a full interview and to provide a written statement detailing the Uber ride. As Mendez was leaving the police station afterwards, defendant called her and asked her if she had left sunglasses in his car. Defendant returned to the police station to tell officers about the phone call.

¶ 12    Upon returning to the police station, Mendez agreed to participate in a consensual overhear on June 22, 2017, whereby she would call defendant while the police listened in and recorded the conversation. On June 22, 2017, Mendez texted defendant to ask whether he had time to talk. After he failed to reply, Mendez called him, and the police recorded the conversation.

¶ 13    In the conversation—which was played for the court—Mendez told defendant that she was "just thinking about" their conversation from the Uber ride and was "wondering how [prostitution] kind of works." Defendant responded, saying that he and Mendez could meet and talk everything over, but Mendez told him that she would rather speak immediately because defendant "kind of freaked [her] out" when he touched her. Defendant responded, "No, no, no. It's... It's... It's ok,

just forget about it." Defendant then told Mendez that he would help her—presumably to learn how to set up a profile on a website where she could solicit clients.

¶ 14    Mendez asked more about the events that took place during their Uber trip. Defendant responded by saying, "[I]t was a stupid moment, I... Uh... I am really sorry about that ***. It was crazy, I don't know how it happened." Mendez reminded defendant that he "stopped [her Uber] trip." Defendant did not deny Mendez's accusation, but again offered to help Mendez.

¶ 15    Mendez asked defendant whether he "liked touching [her]" and mentioned how defendant kissed her during the Uber ride. Defendant responded, saying that it was a "crazy moment" and that he did not know how it happened. Mendez asked defendant why he touched her, and he responded that he did not know, but "something happened" and that he was "really sorry about that." Mendez mentioned how it seemed like defendant wanted oral sex when he exposed himself to her. Again, Defendant did not deny Mendez's allegations, but told Mendez that she had "to lose the shy thing." Mendez asked why defendant exposed himself. He replied, "I don't know, it was a crazy moment." Mendez asked if defendant was "horny" during the trip, and he responded, "Yeah, probably. I don't know."

¶ 16    Mendez asked more about potential clients and defendant advised her to "be careful." He told her that he might refer customers to her, specifically "nice people" and "clean people." Mendez asked if defendant had "other girls." Defendant replied, "[W]e used to have… but we stopped." The two then discussed how much money Mendez could charge potential clients. Defendant advised her to go to a website where she could set up an account to meet clients. The conversation making up the overhear ended shortly thereafter.

¶ 17    During Mendez's cross-examination, the defense asked whether Mendez remembered discussing defendant's various businesses. Mendez remembered discussing defendant's tobacco

business but did not recall discussing the extent of his other business ventures. The defense asked whether she remembered telling defendant that she needed money to settle a problem involving her ex-wife. Mendez replied that she did not. The defense asked whether Mendez and defendant spoke "about the fact that you didn't make as much money as you wanted to at work, and [that] you needed more money." However, Mendez denied that the two spoke about "[her ex-wife] or [her] problems."[3] Upon further questioning, she also denied that she told defendant that she was jealous of other girls at her job who made more money than she did. The defense asked whether Mendez had called defendant to ask for money following the Uber trip, but Mendez denied ever asking him for money.

¶ 18    On redirect, Mendez reiterated that she never told defendant about her ex-wife. When asked how defendant may have nonetheless known of her ex-wife, Mendez indicated that she later learned that she shared a mutual friend with defendant's wife, who knew of her ex-wife. Mendez suggested that her friend may have informed defendant's wife about her ex-wife.

¶ 19    Acevedo testified that she was Mendez's roommate and supervisor at the casino. Although she and Mendez both worked the overnight shift leading into June 16, 2017, Acevedo was unable to give Mendez a ride home after their shift. When Acevedo arrived home later that afternoon, she noted that Mendez was already home and "looked scared, as if something happened." Specifically, Acevedo testified that Mendez "was holding [their dog], and she looked like she was going to cry." Mendez and Acevedo drove to work together that night, where Mendez was uncharacteristically quiet and "didn't say much all night." Upon leaving work the next morning, Acevedo drove Mendez to the police station, but it was closed. Acevedo called the police so that Mendez could meet a police officer at their home. Afterwards, Acevedo had defendant banned from the casino.

---

[3] At the time of trial, Mendez was no longer married to her wife.

¶ 20    Next, Detective Michael Freese of the Prairie Grove police department testified that, on June 17, 2017, he met with Mendez at her and Acevedo's home to discuss Mendez's sexual assault complaint. Freese described Mendez as being "nervous" and "upset" during the interview, as evidenced by her "fidgeting" and "squeezing her hands together."

¶ 21    Freese testified that, after the overhear, he was able to trace defendant to an Elgin address. Freese told defendant that he would like to speak with him regarding "an incident that happened" and defendant volunteered to join Freese at the Elgin Police Department. There, Freese and defendant entered an interview room where Freese told defendant that he would like to read him his rights. Freese read defendant his *Miranda* rights and defendant acknowledged that he understood those rights. Defendant indicated that he would not speak without an attorney present, leading Freese to ask him to stand up. Defendant stood up, turned around, and put his hands behind his back. Freese advised defendant that he was under arrest and transported him to the Prairie Grove police department.

¶ 22    Defendant testified that, aside from working for Uber, he also owned a hookah lounge and a flooring company. Defendant then recounted his version of events taking place during the June 16 Uber ride. Defendant stated that, when he first picked up Mendez, she surprised him by getting into the front seat of his car, as passengers normally sat in his backseats.

¶ 23    Defendant testified that the two spoke of Mendez's work. He testified that Mendez told him that she was trying to get a job as a waitress at the casino, because the waitresses made a lot more money than she did as a security officer. Defendant also testified that Mendez recounted how dancers at strip clubs could earn $100 for a private dance. He testified that Mendez then asked him about his work, and that he told her that he owned hookah and flooring businesses and was in the process of starting a new tobacco business. Defendant reportedly told Mendez that he had recently

sold his hookah business in order to purchase a home. According to defendant, Mendez was impressed with his financial success, telling him, "[W]ow, you make a lot of money" before lamenting that she needed money to "fix" her wife's green card.

¶ 24    Defendant testified that when they neared Mendez's home, he smiled at Mendez and said, "[Y]ou [lesbian guys] can get married over here." Defendant testified that he believed his comment upset Mendez. He said that following his remark, Mendez asked him to end the Uber trip on his phone, before eventually relenting and asking him to drive her the rest of the way home. Defendant then reported taking Mendez home.

¶ 25    Defendant testified he contacted Mendez on June 19 to ask whether she had left a pair of sunglasses in his car. He also testified that Mendez called him later to ask for $400. Defendant said that he denied her request.

¶ 26    Defendant then discussed the overhear. He testified that while he had trouble hearing Mendez while they spoke over the phone, he never made any admissions as to any inappropriate conduct involving Mendez. Defendant asserted that he did not pressure Mendez into prostituting herself. Instead, he testified that he only offered her help in case she decided to create a website profile to do so herself.

¶ 27    During cross-examination, the State mainly focused on defendant's overheard conversation with Mendez. The State asked defendant what he had meant when he told Mendez that "he used to have ladies" and that "[he] used to have other girls." Defendant denied making these remarks. However, Defendant acknowledged telling Mendez that he "would not send her any stupid guys," and that he would make sure anyone that he sent her was "clean." He also admitted that he told Mendez what kind of prices she could charge potential clients.

¶ 28    The State asked defendant whether he recalled Mendez telling him that he "freaked her out" during the overhear. Defendant responded, "Yeah, I heard it. Yeah." However, he testified that Mendez was only "freaked out" because they "were talking sexually." The State then asked defendant about the portion of the overhear where Mendez confronted defendant about exposing his penis to her. Defendant claimed that he did not hear Mendez's accusation, but acknowledged telling Mendez, "[I]t was a stupid moment; it was crazy."

¶ 29    The State asked defendant about the portion of the overhear in which Mendez accused defendant of prematurely ending the June 16 Uber trip. Defendant responded that he did not hear Mendez's accusation because he was working with heavy machinery during the phone call. When the State pointed out that no machinery could be heard in the audio, defendant said, "I was inside of the house, and when she called me, I got out of the house."

¶ 30    The State then brought up the portion of the overhear where Mendez asked defendant whether he liked touching her, and where defendant responded, "[N]o, it was a crazy moment; it just happened. Something happened." Defendant acknowledged his response but denied that anything happened.

¶ 31    The State discussed the portion of the overhear where Mendez asked defendant if he was "horny," leading to the following exchange:

"Q [STATE]: Well what about when she said to you why did you do it? Were you horny? And you said I don't know. It was a crazy moment probably?

A [DEFENDANT]: Can you repeat it, please? I can't—

Q: She asked you if the reason you did it was because you were horny.

Do you remember that question she asked you?

A: Yeah, I remember. Yeah.

Q: And you said I don't know. It was a crazy moment. Probably.

Do you remember that response?

A: Yeah.

Q: So – So you admit that you were horny?

A: I wasn't horny, yeah."

¶ 32    Following defendant's testimony, the defense rested its case. At this point of the trial, defense counsel made a motion to dismiss based on an alleged *Brady* violation. According to the defense, the State wrongfully withheld defendant's cell phone, which would have disproved Mendez's testimony through "a location services search." In response to this argument, the State pointed out that defense counsel had not provided any proof that the cell phone contained exculpatory evidence. The State also provided that, pursuant to a previous court decision, the circuit court authorized defendant to examine his cell phone. Accordingly, the State argued the phone was not withheld from defendant. After agreeing with the State's arguments, the court denied defendant's motion.

¶ 33    Following closing arguments, the trial court found defendant guilty of all seven counts. The matter proceeded to sentencing. The court noted that it had received and reviewed the presentence investigative report (PSI). The State then presented the court with a victim impact statement that Mendez prepared, while the defense presented mitigation evidence consisting of several letters that were written by defendant's family members. Both the State and defendant argued regarding the various aggravating and mitigating factors.

¶ 34    While sentencing defendant, the court provided:

"The court has reviewed the letters submitted by the defense. The court first notes that it has considered all statutory factors in aggravation and mitigation, including the cost

of incarceration to the taxpayers of the state. The court finds that the defendant's conduct did threaten harm, serious harm, to Gabriela Mendez. The court notes that the sex offender risk assessment that was provided to the court *** indicates, I quote, '[defendant] received a total score of four which places him in Risk Level IVa, above average risk category. For being charged or convicted of another sexual offense.' It goes on to state, 'There is concern that [defendant's] alleged offenses were at minimum opportunistic and at worst predatorial. [Defendant] was somewhat defensive and inconsistent about his information, and in conclusion, based upon the available information, it is believed that [defendant] is at above average risk of reoffending.' "

After noting that "the vast majority or Uber drivers and Lyft drivers" were good and responsible people, the court found that defendant "tried to take advantage" of Mendez and therefore, "a sentence of imprisonment [was] necessary, not for the least reason of deterring this type of conduct in the future." The court noted that probation would "indeed deprecate the seriousness of this offense."

¶ 35    The court merged count 2 into count 1 and sentenced defendant to five years' incarceration for the attempted aggravated criminal sexual assault conviction. The court also merged count 3 into count 4 and sentenced defendant to five years' incarceration for the aggravated criminal sexual abuse conviction. Defendant received three years' incarceration for the aggravated battery conviction, two years' incarceration for the unlawful restraint conviction, and two years' incarceration for the promoting prostitution conviction. All the sentences were ordered to be served concurrently. Defendant timely appeals.

¶ 36                                II. ANALYSIS

¶ 37    On appeal, defendant argues: (1) that the evidence adduced at trial was insufficient to establish defendant's guilt; (2) that defendant received ineffective assistance of counsel during trial; and (3) that defendant's sentence was excessive. We consider each argument in turn.

¶ 38                              A. The Sufficiency of the Evidence

¶ 39    First, while defendant challenges the sufficiency of the evidence supporting his conviction, we find that the evidence adduced at trial adequately proved his guilt beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence securing his or her guilt, an appellate court should not seek to retry the defendant. *People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 44. Instead, a reviewing court should determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." (Emphasis in original.) *Id.* (citing *People v. Collins*, 106 Ill. 237, 261 (1985)). "A reviewing court will not substitute its judgment for that of the fact finder on questions regarding the weight to be given a witness's testimony, the credibility of the witnesses, the resolution of inconsistencies and conflicts in the evidence, and the reasonable inferences to be drawn from the testimony." *Id.* "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 40    Here, defendant does not specifically argue that the evidence establishing any of the elements of the various counts was insufficient. Instead, defendant argues that the only evidence suggesting his guilt—Mendez's testimony—was unbelievable and therefore could not support a guilty verdict. We disagree.

¶ 41    The record supports the trial court's findings as to Mendez's credibility. As set forth by the record, Mendez's testimony was clear, believable, and corroborated by several other witnesses. For example, Acevedo corroborated Mendez's testimony by testifying about Mendez's behavioral

shifts following the assault. She testified that upon returning home from work on the afternoon of June 16, 2017, she noticed that Mendez appeared to be scared and looked as if she was going to cry. According to Acevedo, Mendez was also uncharacteristically quiet while at work that night. Detective Freese also testified regarding Mendez's frightened demeanor during his interactions with her. Consequently, these abnormal behavioral shifts corroborate Mendez's traumatic version of events. See *In re C.C.*, 224 Ill. App. 3d 207, 215 (1991) (holding that a victim's sexual abuse allegations were corroborated by evidence of the victim's unusual behavior).

¶ 42    Most importantly though, Mendez's version of events was corroborated by the overhear. In the portion of the overhear in which Mendez told defendant that he "freaked [her] out," defendant acknowledged upsetting her by saying, "No, no, no. It's... It's... It's ok, just forget about it." When pressed by Mendez, defendant continued, "[I]t was a stupid moment, I... Uh... I am really sorry about that ***. It was crazy, I don't know how it happened." By admitting that he engaged in a "stupid moment," defendant recognized his actions and therefore corroborated Mendez's recollection of the assault. By apologizing for his actions, defendant strongly inferred his own guilt. *People v. Hubner*, 2013 IL App (4th) 120137, ¶ 29 (reasoning that a defendant's apology creates a compelling inference of guilt).

¶ 43    In the portion of the overhear in which Mendez discussed how defendant touched her and kissed her during the Uber ride, he acknowledged that "something happened" and again apologized. Once again, defendant's recorded acknowledgements and apologies suggest that Mendez's accusations—as laid out in her testimony—were truthful. *Id.* For these reasons, we disagree with defendant's contentions that Mendez's testimony was unreliable and uncorroborated.

¶ 44    Nonetheless, defendant argues that Mendez's testimony was unreliable because she was unable to remember certain pertinent facts involving the Uber trip. For instance, defendant asserts that Mendez was unable to recall whether defendant ever mentioned several aspects of his work to her, whether she told defendant that she was not paid well, whether she told defendant of her ex-wife's alleged citizenship problems, whether she mentioned her coworkers engaging in "after hours work," and more.

¶ 45    However, defendant mischaracterizes Mendez's testimony. The purported "facts" that Mendez allegedly misremembered were never established at any point in the record. Instead, these "facts" originated solely from defendant's version of events. With this in mind, Mendez did not recall defendant's alleged "facts" because, according to her, those "facts" never occurred. The following exchange between the defense and Mendez highlights this point:

"Q [DEFENSE]: And do your recall telling him about your wife and those money problems?

A [MENDEZ]: No.

Q: No conversation like that existed at all?

A: Not about my wife or my problems.

Q. Or your money problems, okay. Do you remember telling him in that conversation that you were jealous of the other girls making money after work?

A: No."

¶ 46    Given the problems that we have already identified with defendant's testimony, the trial court was well within its purview to find that Mendez was credible, despite her refusal to validate every questionable aspect of his version of events.

¶ 47    Defendant also argues that Mendez's testimony was untrustworthy because she did not immediately make any outcry statements following the alleged assault. While Mendez did wait until the following morning to tell Acevedo about the assault, this fact—taken in isolation—is insufficient to rebut the overwhelming evidence establishing defendant's guilt. *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993) (holding that a victim's testimony should not be rejected "merely because she did not report the incident to the police immediately").

¶ 48    Having found that the trial court's credibility determination was supported by the evidence, we also determine that the trial court's determination of defendant's untrustworthiness was similarly supported by the record.  For instance, defendant's testimony was expressly contradicted by his own words in the overhear. During the portion of defendant's cross-examination involving the overhear, the following exchange took place:

"Q [STATE]: She asked you if the reason you did it was because you were horny.

Do you remember that question she asked you?

A [DEFENDANT]: Yeah, I remember. Yeah.

Q: And you said I don't know. It was a crazy moment. Probably.

Do you remember that response?

A: Yeah.

Q: So – So you admit that you were horny?

A: I wasn't horny, yeah."

In this exchange, defendant clearly admits telling Mendez that he was "probably" horny, before immediately contradicting himself by saying that "[he] wasn't horny, yeah."

¶ 49    Defendant also contradicted himself when the State asked him about the portions of the overhear in which Mendez accused him of prematurely ending the Uber trip. During this line of

questioning, defendant suggested that he was unable to hear Mendez during the phone call because he was working in a home with heavy machinery. However, when asked about the lack of mechanical sounds in the recording, defendant backtracked, claiming that "[he] was inside of the house, and when [Mendez] called [him], [he] got out of the house." Clearly, defendant could not have simultaneously been inside and outside of a house during the phone call. If he did move outside of the house after receiving the call, then any heavy machinery inside of the home would not have precluded him from hearing Mendez.

¶ 50    In sum, the trial court's credibility assessments are reasonable: Mendez's testimony was corroborated while the defendant's testimony was uncorroborated and inconsistent with the overhear. For this reason, we conclude that any reasonable trier of fact could have found defendant guilty beyond a reasonable doubt.

¶ 51                            B. Ineffective Assistance of Counsel

¶ 52    Next, defendant argues that he is entitled to a new trial because his trial counsel was ineffective. To prevail on a claim of ineffective assistance, a defendant must satisfy the test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984), by showing that counsel's performance "was deficient and that the deficiency prejudiced the defendant." *People v. Haissig*, 2012 IL App (2d) 110726, ¶ 13 (citing *Strickland*, 466 U.S. at 687). A defendant's failure to establish either prong of the *Strickland* test is fatal to his or her claim of ineffective assistance. *People v. Henderson*, 2013 IL 114040, ¶ 11. We review *de novo* claims of ineffective assistance. *People v. Davis*, 153 Ill.App.3d 790, 794 (2004).

¶ 53    Here, defendant argues that his trial counsel was ineffective for two reasons. First, defendant argues that he was denied effective assistance when his trial counsel failed to meaningfully cross-examine Mendez as to specific aspects of the alleged assault. Second,

defendant argues that his trial counsel was ineffective for relying on a defense with no logical basis. Both of these arguments lack merit.

¶ 54                    1. Mendez's cross-examination

¶ 55    First, defendant has not shown that his trial counsel's cross-examination of Mendez was objectively unreasonable or resulted in prejudice. To meet the deficient performance prong of the *Strickland* test, a defendant must show that their counsel's performance fell below an objective standard of reasonableness as set by professional norms. *People v. Ganus*, 185 Ill. 2d 355, 361 (1998). Because defense attorneys should be afforded considerable leeway in determining the appropriate strategy for a particular case, courts entertaining ineffective assistance claims should presume that an attorney's conduct falls within the range of reasonable assistance. *People v. Simms*, 192 Ill. 2d 348, 402 (2000).

¶ 56    Furthermore, in order to satisfy the *Strickland* test's prejudice prong, "[t]he defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). For purposes of this prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 57    Here, defendant argues that his trial counsel's cross-examination of Mendez was objectively unreasonable because counsel failed to ask Mendez specific questions detailing the alleged assault. Defendant also argues that his counsel unreasonably failed to elicit testimony regarding Mendez's size, athleticism, and ability to have defended herself from him. However, the record indicates that counsel's choice to refrain from these topics was rooted in tactics rather than incompetence.

¶ 58    From the record, it is apparent that defense counsel's main strategy was to challenge Mendez's credibility by suggesting that she had a financial motive in accusing defendant of the assault. During Mendez' cross-examination, defense counsel implied that Mendez was struggling financially. Counsel repeatedly asked questions regarding Mendez's financial situation and any monetary problems that Mendez may have faced regarding her ex-wife's citizenship. Furthermore, by asking Mendez whether she recalled speaking to defendant about his businesses, or whether she recalled asking defendant for $400, defense counsel suggested that Mendez saw defendant's financial success as a potential solution to her monetary woes.

¶ 59    Defense counsel's strategy becomes even more apparent when one considers defendant's direct examination and closing arguments. During defendant's direct examination, counsel asked defendant about any conversations that he shared with Mendez regarding his businesses. This line of questioning—coupled with defendant's responses—again suggested that Mendez was aware of defendant's wealth. Counsel elicited testimony to propose that Mendez was impressed with defendant's financial success, that Mendez needed money to "fix" her ex-wife's green card, and that Mendez had asked defendant for money.

¶ 60    Furthermore, during closing arguments, defense counsel provided the following:

   "[Mendez] told [defendant] she needs money. She looks at [defendant] as being successful. He sold his hookah business for $40,000. He sold -- He's buying a house. He has money left over. She knows she wants to get money for her then wife to get legal papers. It's more likely that she is going to put the stress on him to get some money from him. And that's what she called him about.

***

Bottom line is it's not logical. What is logical is that she was trying to make a mark, get her money and put the pressure on him to settle with her for some amount." Again, these statements indicate that defense counsel sought to undermine Mendez's credibility by drawing attention to her financial motivations.

¶ 61    Consequently, asking Mendez to detail the alleged assault or to describe her athleticism would not have furthered this strategy. Therefore, defense counsel's tactical choice to abandon those subjects in order to focus on his legitimate trial strategy do not support an ineffective assistance claim. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (finding that "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect").

¶ 62    Furthermore, defendant has not established prejudice resulting from trial counsel's cross-examination of Mendez. While defendant never explicitly enumerates how his counsel's allegedly deficient performance specifically resulted in prejudice, he seems to suggest that he was prejudiced because defense counsel could have tipped the scales by questioning Mendez in a more effective manner. To this point, defendant contends that the evidence at trial was "closely balanced." However, this contention is flawed.

¶ 63    Defendant's assertion that the evidence here was "closely balanced" is unsupported by the record. As discussed above, the evidence adduced at trial overwhelmingly established defendant's guilt. Mendez's incriminating testimony was reliable, corroborated, and only rebutted by defendant's dubious testimony. The overhear was particularly damning, as it documented defendant's acknowledgments of touching Mendez, kissing Mendez, and exposing himself to Mendez. The overhear similarly documented defendant's apologies for his actions, which created a strong inference of guilt. *Hubner*, 2013 IL App (4th) 120137, ¶ 29. On the other hand,

defendant's testimony was rife with contradictions and was largely uncorroborated. Therefore, given the overwhelming evidence of defendant's guilt, it is unlikely that defendant's trial would have ended any differently but-for counsel's cross-examination of Mendez. Consequently, defendant has failed to show prejudice resulting from Mendez's cross-examination.

¶ 64                                      2. The *Brady* argument

¶ 65    Second, defendant has failed to show that he was prejudiced by defense counsel's *Brady* claims. Defendant seemingly suggests that counsel's *Brady* claims resulted in prejudice because they kept counsel from developing a more persuasive trial strategy.[4] Defendant also suggests that this prejudice was more pronounced because the evidence adduced at trial was "closely balanced." Regardless of the reasonableness of trial counsel's *Brady* arguments, given the overwhelming evidence of defendant's guilt, they could not result in any prejudice under *Strickland*. *Evans*, 186 Ill. 2d at 93.

¶ 66    First, defendant is incorrect to assume that defense counsel's *Brady* arguments distracted counsel from developing a more convincing trial strategy. As discussed above, counsel *did* develop an underlying trial strategy that was completely independent of his *Brady* claims—to undermine Mendez's credibility by drawing her financial motives into focus. Indeed, defense counsel's *Brady* arguments made up a relatively small portion of the record after the defense rested its case, as opposed to the numerous references defense counsel made to Mendez's financial situation. Therefore, defendant cannot reasonably suggest that the *Brady* arguments kept counsel from developing alternative trial strategies.

¶ 67    Finally, as we've discussed above, the evidence here was not closely balanced; it overwhelmingly established defendant's guilt. Therefore, it is unlikely that defendant's trial

---

[4] As provided above, defendant's exact arguments regarding prejudice are unclear.

would have ended any differently but-for defense counsel's *Brady* arguments. For these reasons, defendant has failed to establish that he was prejudiced by his trial counsel's performance.

¶ 68                                    C. Defendant's Sentence

¶ 69    Finally, defendant argues that his sentence was excessive for two reasons. First, defendant argues that his sentence was excessive because the trial court failed to properly consider defendant's good character. Second, defendant argues that the court improperly considered an aggravating factor that was implicit in several of defendant's convicted counts. Both arguments miss their mark.

¶ 70                                    1. Mitigating factors

¶ 71    First, contrary to defendant's arguments, the record illustrates that the court properly considered all the relevant mitigating factors prior to sentencing defendant. Because a trial court is in the best position to determine and consider relevant sentencing factors such as credibility, demeanor, and moral character, trial courts are given wide latitude in sentencing defendants. *People v. O'Neal*, 125 Ill. 2d 291, 297 (1988). This wide latitude should not be disturbed unless a trial court has ignored pertinent mitigating factors, or relevant factors in aggravation. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). However, there is a strong presumption that the trial court properly considered all of the relevant mitigating and aggravating factors in crafting a sentence, "and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors." *Flores*, 404 Ill. App. 3d at 158. Absent an abuse of discretion, a reviewing court should not alter a trial court's sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 72    Here, while defendant claims the court did not properly consider defendant's good character before imposing its sentence, he contradicts this assertion by providing that

"[defendant's] positive attributes were brought to the court's attention during the sentencing hearing." Indeed, the record indicates that the court considered all of the relevant mitigating factors. For instance, the court acknowledged that it reviewed defendant's PSI, which detailed defendant's lack of a criminal history. The court also stated that it reviewed certain letters that defendant's wife and mother prepared, which detailed defendant's caring personality towards his mother. Furthermore, the court affirmatively stated that it considered "all statutory factors in aggravation and mitigation."

¶ 73    Finally, defendant has not provided—nor even attempted to provide—any explicit evidence from the record to suggest that the trial court did not consider any pertinent mitigating factors. Pursuant to *Flores*, this failure to provide any explicit evidence is fatal to defendant's claim. *Id.* For these reasons, we find defendant has failed to show that the trial court neglected to consider any relevant mitigating factors.

¶ 74                                   2. Double enhancement

¶ 75    Finally, the court did not improperly consider any aggravating factors that were inherent in defendant's crimes. It is well known that a factor inherent to an offense may not subsequently be used as an aggravating factor during sentencing. *People v. Dowding*, 388 Ill. App. 3d 936, 942 (2009). "Such dual use of a single factor is often referred to as 'double enhancement.' " *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. However, there is a strong presumption that trial courts employ proper legal reasoning while sentencing defendants, so sentencing decisions should be afforded deference. *Dowding,* 388 Ill. App. 3d at 942-43. Consequently, it is a defendant's burden to affirmatively prove that a trial court relied on improper factors during sentencing. *Id.* at 943. "Whether a trial court relied on an improper factor when sentencing a defendant is a question of law, subject to *de novo* review." *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 13.

¶ 76    When determining whether a trial court has utilized proper sentencing factors, a reviewing court should examine the entire record rather than a select portion of the underlying record. *Id.* If the entire record indicates that a trial court only mentioned an improper aggravating factor in passing, without giving the factor weight, a remand for a new sentencing hearing is not required. *People v. Latona*, 268 Ill. App. 3d 718, 730 (1994). Furthermore, a judge may consider and reference "the nature and circumstances of the offense" while rendering a sentence, which may necessarily include the elements of an offense. *People v. Hunter*, 101 Ill. App. 3d 692, 694 (1981).

¶ 77    For example, in *Abdelhadi*—which defendant primarily relies on in making his argument—this court found that the trial court improperly considered the defendant's threat of harm as an aggravating factor when sentencing the defendant for an aggravated arson. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 14. There, during the defendant's sentencing hearing, the trial court noted:

> " 'Specifically in aggravation the [c]ourt has considered that the conduct caused by the defendant did, in fact, endanger the lives of individuals. That he was on probation at the time of the event. Court has considered his criminal history in aggravation.
>
> The Court in mitigation has considered the defendant's age, his minimal education and other factors in mitigation.' " *Id.*, ¶ 4.

¶ 78    Upon review, we found that the trial court's reference to the defendant's threat of harm "did not amount to merely a mentioning within the 'nature and circumstances,' " *Id.*, ¶ 14. Instead, we noted that the trial court clearly used this factor as an aggravating factor in sentencing defendant. *Id.* Therefore, because the threat of harm was inherent in the offense of aggravated arson, the court's use of this factor improperly resulted in double enhancement. *Id.*

¶ 79    Here, in arguing that the trial court engaged in double enhancement, defendant references only one portion of his sentencing hearing, in which the court made the following finding:

> "The court has reviewed the letters submitted by the defense. The court first notes that it has considered all statutory factors in aggravation and mitigation, including the cost of incarceration to the taxpayers of the state. The court finds that the defendant's conduct did threaten harm, serious harm, to Gabriela Mendez."

¶ 80    According to defendant, because the threat of harm "was implicit in [c]ounts one through five," the trial court's reference to "serious harm" resulted in double enhancement. However, this argument necessarily fails for several reasons.

¶ 81    First, we note that after examining the record, it does not seem as if defendant made this argument until appeal. For this reason, defendant forfeits his argument. *People v. Haywood*, 407 Ill. App. 3d 540, 551 (2011). "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Furthermore, we note that defendant has not suggested that we analyze this argument under a plain-error analysis. Therefore, he forfeited plain-error review. *Id.* at 546.

¶ 82    Forfeiture aside, defendant's argument also fails because the trial court's comments were proper. While the court did reference the harm that defendant inflicted on Mendez, unlike the trial court's language in *Abdelhadi,* the court's language here did not provide that the harm was considered "[s]pecifically in aggravation." Instead, the court expressly relied on the seriousness of defendant's offense and the need for deterrence when crafting its sentence:

> "The court notes that the vast majority of Uber drivers and Lyft drivers are good and responsible people, which is fortunate since riders of Uber and Lyft literally put their

lives into the hands of their drivers. The defendant, on the other hand, tried to take advantage of this situation and turned Gabriela Mendez's ride into what she described as a nightmare.

*As a result*, the court believes that a sentence of imprisonment is necessary, *not for the least reason of deterring this type of conduct in the future*. The court feels that probation would indeed deprecate the seriousness of this offense." (Emphasis added.)

For these reasons, we find that defendant has not met his burden to rebut the strong presumption that the trial court properly sentenced him.

¶ 83                                          III. CONCLUSION

¶ 84    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 85    Affirmed.