2021 IL App (1st) 182633-U

No. 1-18-2633

Order filed August 25, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 1094 |
| | ) | |
| SEDERICK MADISON, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for home invasion and aggravated sexual assault premised on home invasion affirmed. Trial counsel was not ineffective for failing to object to treating physician's testimony about victim's statement to him.

¶ 2    Following a bench trial, defendant Sederick Madison was found guilty of 4 counts of home invasion, 4 counts of aggravated criminal sexual assault, and 1 count of residential burglary. He was sentenced to a total of 26 years' imprisonment. On appeal, defendant claims that trial counsel

was ineffective for failing to object to a treating physician's testimony regarding the victim's statement to him at the hospital, which defendant claims was inadmissible hearsay. We affirm.

¶ 3    Defendant was charged with 6 counts of home invasion, 10 counts of aggravated kidnapping, 9 counts of aggravated criminal sexual assault, 10 counts of residential burglary, and 1 count of aggravated battery. Relevant here are counts 3 and 22, the two counts upon which the trial court entered judgment. Count 3 alleged that defendant committed home invasion (720 ILCS 5/19-6(a)(2) (West 2014)) in that he, without authority, knowingly entered the dwelling place of T.W., knew or had reason to know that one or more persons were present, and intentionally caused abrasions to T.W.'s face and body. Count 22 alleged that defendant committed aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4) (West 2014)) when he committed an act of sexual penetration upon T.W. by the use or threat of force during the course of a home invasion.

¶ 4    As defendant only challenges counsel's failure to object to one portion of one witness's testimony, we recite only those facts necessary to decide this appeal.

¶ 5    T.W. testified that she lived in a basement apartment on the 6000 block of South Loomis Boulevard with her two children. T.W. slept in the bedroom, and her children slept on a pull-out bed in the living room. Between 1:30 and 2:00 a.m. on May 9, 2014, T.W. put her children to bed, checked her front and back doors, and went to bed. The back door of the apartment, which T.W. identified in a photograph, was locked and secured with a wooden board underneath the doorknob. The front door, which T.W. also identified in a photograph, was closed and secured with two locks. T.W.'s roommate Syvill had no keys to the outer doors of the apartment; T.W. had to let Syvill in when she came to the apartment.

¶ 6    Shortly after T.W. fell asleep, she awoke because defendant, whom she identified in court, was on her back, holding the bed covers over her face. She was lying face down but recognized defendant's voice as belonging to a man named "Sed," whom she knew from the neighborhood. She did not see defendant's face during this incident. T.W. did not know how or when defendant entered the apartment and did not know how long he was there. She pushed herself up to her knees and began "tussling" with defendant while begging him not to hurt her or her children. Defendant tied her hands behind her back with a bra strap and hit her forehead and face with a sharp object.

¶ 7    T.W. heard defendant "unzip hi[m]self;" he then inserted his penis into her vagina. Defendant removed his penis and inserted his hand into T.W.'s vagina to "clean" her while she was facedown on the bed with a pink towel over her head. Defendant asked T.W. if she had any bleach, and she said yes. He grabbed her arm and led her to the kitchen with the towel over her head and her arms tied behind her back, then led her back to the bedroom. T.W. could see defendant's hands cleaning the bed, the wall, and a light fixture, and she could smell bleach. Defendant then stuffed some of T.W.'s belongings into bags near her bed, told her to count to 100, and walked out of the room with the bags. In a photograph, T.W. identified the pink towel on her bed and bleach stains on the towel.

¶ 8    Defendant returned and walked T.W. to the back door. He told her to stand by the back door and not move until he was gone, which T.W. did. When T.W. heard defendant leave, she broke the bra strap by pulling her hands apart, wrapped the towel around her body, locked the back door, and ran to her upstairs neighbors' apartment. She encountered a man she knew as "Main" and told him someone "broke into" her apartment and raped her. Main and Marquita Banks called

the police. Police arrived and spoke to T.W. An ambulance transported her to the hospital, where she was treated for injuries and a rape kit was conducted.

¶ 9     In a series of photographs, T.W. identified herself as she appeared at the hospital. She identified the black bra strap defendant used to tie her hands behind her back, which is shown tied around her right wrist. These photographs depict cuts to T.W.'s forehead, lower right face, left forearm, and right shoulder. T.W. testified that defendant caused these injuries with "whatever he had in his hand."

¶ 10     On November 14, 2015, T.W. identified defendant to police in a photo array, which was entered into evidence.

¶ 11     On cross-examination, T.W. testified that defendant's penetration of her lasted approximately five minutes. She denied telling a doctor the penetration lasted 45 to 60 minutes. As of May 9, 2014, T.W. had known defendant for approximately one year, but they were not friends. Defendant had visited a woman named Jocelyn in T.W.'s basement apartment, but he did not spend time with T.W.

¶ 12     The three front windows of T.W.'s apartment were near the couch where her children slept and faced toward the street. In the days prior to May 9, 2014, T.W. had left one of the windows open and placed a half screen in it. When she went to bed on May 9, 2014, the window shades were down. T.W. believed "the only possible way" defendant entered her apartment was through the front windows.

¶ 13     On redirect examination, T.W. testified that her bedroom had a window, but it did not open all the way, and not even a child could crawl through it. There was also a window in the bathroom, but it was covered by a garbage bag.

¶ 14    Dr. Jeremy Rothfield was qualified as an expert in the field of emergency medicine. He testified that he treated T.W. at St. Bernard Hospital on May 9, 2014. Before interacting with Rothfield, T.W. told two nurses she had been raped. Rothfield interviewed T.W. at approximately 6:00 a.m. Rothfield summarized T.W.'s statement to him as follows:

> "[S]he was sleeping in bed when about 1:30 a.m. in the morning and [*sic*] intruder climbed through the window and began to assault her. She had told me he placed a pillow case and sheet over her head. Vaginally penetrated her for 45 to 60 minutes and she said the intruder tied her arms down with her bra straps, hit her in the face a couple of times and then left."

Defendant did not object to this testimony.

¶ 15    Rothfield observed abrasions to T.W.'s forehead, right cheek, and both arms. He noted white discharge in her vagina, which was otherwise uninjured. He conducted a criminal sexual assault kit, including vaginal swabs.

¶ 16    On cross-examination, Rothfield testified T.W. stated "her hands were tied to the bed." He did not document any injuries to her wrists.

¶ 17    Chicago police detective Roxana Hopps testified that she was assigned to investigate a criminal sexual assault at approximately 3:55 a.m. on May 9, 2014. She interviewed T.W. at St. Bernard Hospital, then went to T.W.'s apartment and directed evidence technician John Buczkiewicz regarding the recovery of physical evidence. Hopps noticed a strong odor of bleach in T.W.'s bedroom and saw a bleach-stained towel on the bed. The bed itself also had bleach stains. Hopps identified the bleach stains on the towel and bed in photographs.

¶ 18    Hopps determined that the three front windows were the "possible point of entry" because T.W. stated "she had just purchased the screens for the front windows to allow her to open those front windows to allow air to circulate within her apartment." T.W. also said "she had put a screen in the middle window in this set of three. There is also a screen on the window furthest away from the door." Buczkiewicz told Hopps there were no suitable fingerprint impressions he could recover from the windows.

¶ 19    On November 14, 2015, T.W. identified defendant in a photo array. On December 16, 2015, Hopps arrested defendant, whom she identified in court.

¶ 20    On cross-examination, Hopps testified the front windows of T.W.'s apartment were closed when she arrived on the scene. May 9, 2014 was a rainy night, and there was mud in the yard outside the windows. Hopps did not recall seeing any footprints in the mud outside the windows and did not see any muddy footprints in the living room or bedroom.

¶ 21    When Hopps interviewed T.W. at the hospital, T.W. stated that defendant had been to her apartment once before at her invitation. She also stated that she opened the window furthest from the front door two days before this incident and left it open. T.W. stated she did not see defendant cleaning the walls or her bed with bleach because her face was covered during this incident.

¶ 22    The next witness, Chicago police evidence technician John Buczkiewicz, was assigned to process a sexual assault scene in a basement apartment at approximately 4:57 a.m. on May 9, 2014. He detected an odor of bleach in the bedroom. Hopps asked Buczkiewicz to process the three front windows of the apartment for fingerprints as a possible point of entry. He could not find any fingerprint impressions suitable for comparison. The rainy and humid conditions that night may

have erased fingerprint impressions on the windows. Buczkiewicz then photographed T.W.'s injuries at the hospital.

¶ 23    In a series of photographs, Buczkiewicz identified T.W.'s apartment as it appeared when he processed the scene. These photographs depict a three-story apartment building. The three front windows of defendant's basement apartment, which Buczkiewicz processed for fingerprints, are at ground level, and there is grass in front of them. The windows appear to be closed with the blinds down. Inside the front windows is a room with a pull-out bed. Photographs of a bedroom depict a mattress, on top of which are pillows and a pink towel with white spots.

¶ 24    On cross-examination, Buczkiewicz testified he only tested the outside of the front windows for fingerprints, not the inside. He did not see rain on the front windows. All three front windows were closed when Buczkiewicz arrived and when he photographed them; he did not close any of them. Buczkiewicz did not test the doorknob of the apartment's back door or the kitchen cabinets for fingerprints. He did not recover a bra or any type of sharp object.

¶ 25    The parties stipulated that T.W. identified defendant in a photo array to a Detective Evans on November 14, 2015.

¶ 26    The parties stipulated that evidence technician Kelly Comiskey collected a sealed criminal sexual assault kit pertaining to T.W. from St. Bernard Hospital on May 9, 2014. He provided the criminal sexual assault kit to the Illinois State Police for forensic analysis.

¶ 27    The parties stipulated that investigator Brian Lee obtained a buccal swab from defendant on February 29, 2016, and gave it to Chicago police, who provided it to the Illinois State Police crime laboratory.

¶ 28     The parties stipulated that Illinois State Police forensic scientist Christopher Webb conducted DNA analysis on samples included in the criminal sexual assault kit and defendant's buccal swabs. Defendant's DNA profile matched the DNA profile on the vaginal swabs.

¶ 29     Defendant moved for a directed finding, which was denied.

¶ 30     The parties stipulated that James Killingsworth was the landlord of T.W.'s apartment building. In early 2014, he installed bars on a window off the gangway on the left side of the building.

¶ 31     Defendant moved one photograph of T.W.'s bed into evidence.

¶ 32     In closing, neither the State nor defendant referenced Rothfield's testimony about T.W.'s statement to him. Defendant argued that T.W. let him into her apartment, and there was no evidence he used force to have sex with her.

¶ 33     The court found defendant guilty of 4 counts of home invasion premised on causation of injury and commission of a sex offense; 4 counts of aggravated criminal sexual assault premised on causation of bodily harm and commission of another felony; and 1 count of residential burglary. It acquitted defendant of 2 counts of home invasion with a dangerous weapon, 5 counts of aggravated criminal sexual assault premised on defendant's use of a dangerous weapon, making a threat to T.W.'s life, and commission of a kidnapping, all 10 counts of aggravated kidnapping, 9 counts of residential burglary, and 1 count of aggravated battery premised on strangulation. In announcing its ruling, the court found that "[s]ome aspects of [T.W.]'s testimony were impeached," but her "testimony [was] credible in other aspects." The court stated it believed T.W. "was the victim of a home invasion and an aggravated criminal sexual assault," but did "not believe a sharp object was used." The court did not discuss Rothfield's testimony.

¶ 34    Defendant filed a motion for a new trial, which argued the State failed to prove him guilty beyond a reasonable doubt. The court denied defendant's motion.

¶ 35    The court merged three home invasion counts and the residential burglary count into home invasion count 3 (premised on defendant causing injury to T.W.). It merged three aggravated criminal sexual assault counts into aggravated criminal sexual assault count 22 (premised on force or threat of force during a home invasion). The court sentenced defendant to 18 years' imprisonment for aggravated criminal sexual assault and 8 years for home invasion, to run consecutively. Defendant did not file a motion to reconsider sentence.

¶ 36    On appeal, defendant argues that defense counsel was ineffective for failing to object to Rothfield's testimony summarizing T.W.'s prior consistent statement to him at the hospital. Specifically, defendant claims that Rothfield's testimony that T.W. told him a man climbed through a window, put a pillowcase and sheet over her head, and tied her arms prior to raping her was inadmissible hearsay that improperly bolstered T.W.'s credibility.

¶ 37    We evaluate a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Cherry*, 2016 IL 118728, ¶ 24. A defendant must show his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *People v. Scott*, 2015 IL App (1st) 131503, ¶ 27. The failure to satisfy either prong precludes a finding of ineffective assistance. *People v. Peterson*, 2017 IL 120331, ¶ 79. To satisfy the prejudice prong of an ineffective assistance of counsel claim, a defendant must show that, but for counsel's deficient performance, a reasonable probability exists that the result of the proceeding would have been different. *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 45. A reviewing court "may dispose of an ineffective assistance of counsel claim by proceeding directly

to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17. We do so here.

¶ 38 Defendant has not established that counsel's failure to object to Rothfield's testimony prejudiced him such that the outcome of the trial would probably be different. We analyze claims of ineffective assistance in light of the entire record (*People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010)), and the portion of Rothfield's testimony at issue was a small piece of otherwise overwhelming evidence of defendant's guilt. Even if Rothfield's testimony about T.W.'s statement to him had been excluded, it is unlikely the outcome would have been different.

¶ 39 There is no dispute that defendant was in T.W.'s apartment and had intercourse with her on May 9, 2014. Further, T.W.'s testimony alone was sufficient to establish defendant entered her apartment without authority and sexually assaulted her by force, as required to find defendant guilty of home invasion and aggravated criminal sexual assault as charged. See 720 ILCS 5/19-6(a)(2) (West 2014); 720 ILCS 5/11-1.30(a)(4) (West 2014). T.W. testified that she locked both apartment doors before going to sleep. When she awoke, defendant was on her back, holding her down, and she did not know how he got in. Thus, her testimony supported an inference that defendant broke into her apartment while she was sleeping, not that she invited him in, as defendant argued at trial. T.W. also described defendant's violent sexual assault of her and the injuries it caused. T.W.'s testimony alone was sufficient to support the trial court's findings of guilt. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 40 Other evidence, independent of Rothfield's allegedly hearsay testimony, supported the trial court's findings of guilt as well. For example, the photographs of T.W.'s injuries corroborated her description of a forceful sexual assault. Hopps's and Buczkiewicz's testimony that they smelled

bleach in T.W.'s bedroom corroborated her testimony that defendant tried to clean the scene with bleach, which would seem to be a curious move for someone who had just engaged in a *consensual* act of sexual intercourse.

¶ 41　And as a final but not insignificant note, the record contains no indication that Rothfield's allegedly improper testimony impacted the court's findings. The court did not mention Rothfield's testimony in announcing its ruling or in denying defendant's motion for a new trial. Neither party discussed Rothfield's testimony about T.W.'s statement to him in closing argument. Thus, there is no basis from which we can conclude that defendant was prejudiced by the admission of Rothfield's testimony. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."). Even had trial counsel successfully barred Rothfield's testimony, the outcome of the trial likely would have been the same.

¶ 42　Defendant claims that Rothfield's testimony improperly bolstered T.W.'s credibility. He argues that, absent Rothfield's testimony, "there w[ere] sufficient grounds [to] undermine confidence in the verdict—as to the question of whether [defendant] entered the apartment without authority." He points to the trial court's concerns with T.W.'s credibility because of her impeachment on certain issues. But we must defer to the trial court's finding that T.W. was sufficiently credible to support the conclusions that defendant committed home invasion and aggravated criminal sexual assault. See *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 43　Defendant also argues there was no physical evidence that he entered T.W.'s apartment through the window. But physical evidence is not necessary to support his convictions, particularly when, as here, the trial court found T.W.'s testimony largely credible. See *People v. Daheya*, 2013

IL App (1st) 122333, ¶ 76. Thus, we disagree with defendant's claim that his counsel's failure to object to Rothfield's allegedly hearsay testimony prejudiced him.

¶ 44    Because defendant did not establish prejudice under *Strickland*, we need not concern ourselves with the question of trial counsel's performance or the related question of whether the challenged evidence was hearsay in the first instance, as opposed to a statement made for the purposes of medical treatment that would be an exception to the hearsay rule. See 725 ILCS 5/115-13 (West 2014). Defendant's failure to establish prejudice is fatal in itself to his *Strickland* claim. See *Strickland*, 466 U.S. at 697; *Peterson*, 2017 IL 120331, ¶ 79. We thus affirm defendant's convictions.

¶ 45    Affirmed.