2023 IL App (2d) 210565-U
No. 2-21-0565
Order filed March 1, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-1234 |
| | ) | |
| WOJCIECH DZIERZANOWSKI, | ) | Honorable |
| | ) | Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hudson and Kennedy concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's convictions are affirmed because: (1) the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of predatory criminal sexual assault of a child and aggravated criminal sexual abuse, (2) the trial court did not abuse its discretion in the evidentiary rulings concerning (a) the victim's delayed outcry, (b) the cross-examination of the victim's mother, (c) in granting portions of the State's motion to quash subpoenas for the victim's medical and school records, and (d) the indictment did not impede defendant's ability to mount a defense, and (3) and the trial court did not abuse its discretion by allowing the victim to make an in-court identification of defendant's penis because it was not pursuant to an unduly suggestive show-up procedure.

¶ 2   Following a bench trial before the circuit court of Lake County, defendant, Wojciech

Dzierzanowski, was found guilty of five counts of predatory criminal sexual assault of a child (720

ILCS 5/11-1.40(a)(1) (West 2018)) and seven counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). Defendant was sentenced to consecutive 7-year terms of imprisonment for each of the predatory criminal sexual assault convictions, and he was sentenced to 4-year terms of imprisonment for each of the aggravated criminal sexual abuse convictions, which were to run concurrently with each other, with count X being discretionarily consecutive to the predatory criminal sexual assault convictions, for an aggregate 39-year term of imprisonment. Defendant appeals, challenging the sufficiency of the evidence for all convictions. Defendant also challenges, as improper hearsay, the victim's testimony about his initial outcry which occurred several years after the commission of the alleged offenses. Defendant contends that the indictment was improperly vague and argues that the trial court abused its discretion quashing his subpoena of the victim's medical and school records. Defendant contends that his cross-examination of the victim's mother was improperly limited regarding a purported sham marriage and the mother's surreptitious recording of a therapy session involving the victim and his family. Last, defendant contends the trial court abused its discretion regarding the admissibility of a purported in-court identification of his penis based on an improper pretrial photograph show-up procedure. We affirm.

¶ 3                            I. BACKGROUND

¶ 4      We summarize the facts appearing of record. Defendant was born in Poland and was born with hypospadias, a condition affecting his penis. This congenital deformity meant that defendant's urethra did not exit the glans of his penis but resulted in the opening being on the underside of the shaft of his penis. Defendant's condition resulted in urine, as well as ejaculate, being sprayed from the opening on the underside of his penis. The head of defendant's penis

curved downward. Defendant's fertility and ability to have children was otherwise unaffected by the condition.

¶ 5    In November 1999, the victim, J.P., was born to Agnes W., his mother, and Thomas P., his father. At the time of J.P.'s birth, Agnes and Thomas were married, but they soon divorced. J.P. and his mother resided in Glenview, and then they moved to an apartment in Chicago. When J.P. was about five years of age, while he and Agnes were residing in Chicago, Agnes and defendant, whom Agnes had known during her marriage to Thomas, entered into a romantic relationship. In 2006, J.P., his mother, and defendant moved to a residence in Lake Forest. Defendant performed repairs and improvements to the Lake Forest residence over time, eventually finishing the basement with a bedroom for defendant, and later, a bedroom for J.P.

¶ 6    Upon cohabiting with Agnes, defendant undertook more of a parental role regarding J.P. He would discipline J.P. for misbehaving. Defendant's discipline included spanking and, over time, escalated to the point of whipping J.P. with a belt. Nevertheless, there is no evidence in the record from medical or educational personnel who observed J.P. regarding injuries related to discipline.

¶ 7    At trial, J.P. testified about his relationship with defendant and how it evolved. Defendant became a father figure in J.P.'s life. Defendant sometimes took J.P. to work and allowed J.P. to accompany him on errands. According to J.P., defendant frequently spoiled him with gifts. J.P. appreciated having defendant present because his father, Thomas P., was not around very often, and it was nice for J.P. to have a man present with whom he could talk.

¶ 8    J.P. testified that his mother spent most of her time during the week at home. On weekends, however, she usually worked as a wedding photographer, and J.P. was cared for by a babysitter or

by defendant. Defendant's continued presence deepened J.P.'s regard, and he began to confide in defendant regarding "male oriented" issues, like "physical activities" or video games, or topics of interest beyond his mother's experiences or interests.

¶ 9    J.P. testified that, when they moved into the Lake Forest residence, everyone used rooms on the main floor. Typically, defendant and Agnes slept in one room, and J.P. slept in a nearby room. When defendant did not share Agnes's room, he slept in the basement or on the living room couch. Although defendant and Agnes did not marry, she and defendant eventually had two children together, M.D. and A.D. While J.P. originally slept in the children's room on the main floor, when he was about 15 years of age, he moved into the basement bedroom, and his younger brothers occupied the children's room. J.P.'s basement bedroom was about 20 steps from defendant's bedroom.

¶ 10    J.P. testified that, defendant's physical discipline escalated in frequency and severity, he reacted more rebelliously, engendering a kind of vicious circle. The physical abuse testified to by J.P. culminated with an incident in which J.P.'s phone had died, and J.P. failed to contact Agnes or defendant to inform them he would be coming home late. According to J.P., defendant whipped him with a leather belt.

¶ 11    J.P. also testified about the sexual abuse he experienced at defendant's hand. The first instance of abuse occurred when he was seven, during the fall or winter when it was cold outside, and J.P. was wearing red fleece pajamas decorated with penguins. Defendant opened his Hewlett-Packard laptop computer and played a pornographic video. J.P. did not understand at that time what he was seeing. He described the video as depicting oral sexual acts between a woman and a

man. J.P. viewed the video in silence, "kind of perplexed by the whole video," not "know[ing] what to think of it."

¶ 12    As he and defendant watched the video, defendant unbuckled his belt and began to touch J.P. Defendant grabbed J.P.'s buttocks and began to rub his finger on J.P.'s anus, first over J.P.'s clothes, and then progressing to under his clothes. As defendant was rubbing J.P., he also took J.P.'s hand and "led it down [defendant's] pants," until defendant had J.P. take hold of defendant's penis and moved his hand up and down.

¶ 13    J.P. testified that he and defendant were not talking, and J.P. was very confused about what was happening. J.P. described that defendant was laying on the couch, with the laptop to defendant's right and J.P. to defendant's left, propped over defendant's legs with J.P.'s hand down his pants, and with defendant rubbing J.P.'s anus. Next, defendant took his pants off, and, while still laying on the couch, defendant guided J.P.'s head over defendant's penis and inserted his penis into J.P.'s mouth. Defendant kept his hand over J.P.'s head and gently pushed his head up and down. J.P. continued until defendant ejaculated in his mouth.

¶ 14    J.P. testified that, about a month later, the second instance of abuse occurred. It played out in the same general manner as the first. Defendant opened his laptop and started playing a pornographic video. After a few minutes, defendant sat beside J.P. and inquired whether J.P. was enjoying the video. J.P. testified at trial that he did not understand what he was viewing and was "in shock kind of in a way." As J.P. continued to watch, defendant initiated manual sexual contact which progressed to oral sexual activity.

¶ 15    J.P. testified that this became the routine format of the abuse: an instance of abuse would begin with defendant playing pornography, defendant would then initiate manual sexual contact

followed by oral sexual conduct. J.P. related that, at the beginning of an encounter, defendant's penis would initially be soft, and defendant might say that he needed a massage. As the manual contact stimulated defendant, defendant would remove his pants as a signal to transition to oral sexual activity. Defendant would still typically gently guide J. P. onto his penis by pushing his head down. J.P. testified that he was compliant with defendant because he was "just scared to say no to him because he had physically abused" him under the guise of discipline. J.P. did not know the words for what was occurring until he learned them from his classmates in fifth or sixth grade.

¶ 16    J.P. testified that, after the first few instances of abuse, he "remember[ed] very precisely a car ride" with defendant. Defendant told him that the conduct they engaged in was for practice so J.P. would know in the future how to properly have sex. Defendant also told J.P. that, in the future, he would take J.P. to strip clubs and show him everything about sex and sexual activities. J.P. interpreted this conversation to mean that he and defendant were engaging in "a guy thing that stayed between us, and it was like our secret, and it would help [J.P.] in the future." During the period from age 7 to age 11 or 12, defendant was neither threatening nor mean, and J.P. continued to view defendant as a father figure.

¶ 17    J.P. testified that from the age of 7 until the age of 11, the sexual encounters were very gentle. The encounters usually took place on the living room couch. Occasionally, they occurred in rooms in the basement, such as the exercise room or the play area. J.P. related that, between the ages of 7 and 11, defendant would very occasionally initiate an encounter after he emerged from the shower, pulling J.P. into the bathroom, placing J.P. on his knees, and initiating oral sexual activity without the typical preambles of viewing pornography followed by manual sexual stimulation. Despite these occasional bathroom encounters, the primary location of the abuse was

the living room couch. J.P. also described occasions where defendant would tilt J.P.'s head all the way back as he was sitting up and then insert his penis into J.P.'s mouth. J.P. also noted that the sexual encounters with defendant were never only manual sexual acts, rather, the encounters "always involved oral [sexual activity] at some point." J.P. related that, for the abuse occurring between ages 7 and 11, only he and defendant were present in the Lake Forest residence; he could not remember a time when his mother was present.

¶ 18    When J.P. reached about 12 years of age, the sexual activities became "a little bit more intense." J.P. explained that defendant became more aggressive physically and tried to impose much more discipline on J.P. because J.P. had become more rebellious and more frequently disagreed and argued with defendant. The sexual activity, however, was never punitive. In J.P.'s view, defendant "wanted to get off sexually. So that's what he would use [J.P.] for." As an example of the increased intensity, defendant would "try to insert his whole penis down [J.P.'s] throat completely until [J.P.] would touch his crotch, and [defendant] would make [J.P.] pull on his testicles." During this time, defendant added to the encounters a small, black, pill-like vibrator which defendant would insert into his own anus. Defendant did not use the vibrator on J.P. Defendant also became rougher with J.P., grabbing J.P.'s head and forcing his penis into J.P.'s mouth. J.P. also began to understand more fully what was going on and he became "terrified" of defendant.

¶ 19    J.P. testified that, when he was 11 or 12, he told his mother that defendant was teaching him about sex or brought up something sexual in their conversation. The following day, defendant told J.P., in Polish, "[L]ook, what we do in our private time stays between us guys."

¶ 20 J.P. noted that, between the ages of 11 and 14, the location of the sexual encounters began to change. The majority of the encounters occurred downstairs, first in the playroom, and then moving more into defendant's basement bedroom. J.P. recalled that most of the encounters, if not every single time, began with the viewing of pornography on defendant's laptop.

¶ 21 In a brief digression, J.P. acknowledged that, from the first encounter, he was interested in understanding "what [pornography] was about." J.P. admitted that, after the initial sexual encounter with defendant, he would himself search for and view porn without defendant's prompting or presence. J.P. did not, however, pull up pornographic videos when defendant was with him; he only sought and searched for it when he was by himself.

¶ 22 J.P. testified that, when he was 11 or 12, defendant would commonly wear Agnes's pink shorts when the sexual encounters occurred. J.P. described that defendant would start a pornographic video, after which he would change into Agnes's pink shorts. After changing into the shorts, defendant would typically initiate the other aspects of a sexual encounter culminating in oral sexual activity. J.P. identified a pair of pink shorts that were recovered from the Lake Forest residence as the shorts worn by defendant. J.P. further testified that defendant also wore a pair of navy-blue shorts as a precursor to the sexual encounters as well, but less frequently than the pink shorts. J.P. initially described the shorts as "black," explaining he had only seen them in the dark. The navy-blue shorts were also recovered from the Lake Forest residence.

¶ 23 J.P. testified that defendant attempted to anally penetrate him only one time, when J.P. was 14 years of age. When defendant tried to place his penis in J.P.'s anus, J.P. told defendant that he "needed to go to the bathroom and poop," which "grossed [defendant] out," and defendant no

longer wished to try anal sex any more. Despite the trip to the bathroom, defendant made J.P. finish the encounter by "giving him oral sex until he ejaculated."

¶ 24    J.P. testified about the final instance of sexual activity that occurred when he was turning 15. Defendant brought J.P. into the downstairs bathroom to shower together. The two undressed, and defendant told J.P. to get into the shower and left, promising to "be right back." J.P. showered and, when defendant stepped into the shower, J.P. exited. J.P. then went into his room in the basement and locked the door. J.P. testified that the sexual abuse stopped after this occasion, but the physical abuse continued.

¶ 25    J.P. estimated that, from the age of 7 until the age of 11 or 12, the abuse, meaning manual and oral sexual activities, occurred approximately once a month. From the age of 12 to the age of 14, the activity occurred approximately once a week, and after age 14, it become less frequent until it ended after the above-described incident.

¶ 26    J.P. moved out of the Lake Forest residence nine months to a year following the final sexual incident. Specifically, he moved to his father's residence after he completed his junior year of high school when he was 16. J.P. told his mother and father that he wanted to move because of the physical abuse from defendant.

¶ 27    During the time between the last sexual incident and J.P.'s move to his father's residence, defendant completed the downstairs bedroom for J.P., and, once they moved a bed into the room, J.P. slept there every night. J.P. would sometimes use that bedroom to spend the night after helping his mother in one of her photography assignments.

¶ 28    J.P. did not tell anyone about the sexual encounters until he was on spring break when he was 18. J.P., his mother, his brothers, and family friends took a trip to Florida. J.P.'s friend,

Olivia, confided in J.P. about something that had happened to her. Olivia's statement led J.P. to reveal that defendant had touched him sexually.

¶ 29    After J.P.'s statement to Olivia, he informed his mother that he wanted to begin therapy, explaining to her it was due to the defendant's physical abuse. In his first session, J.P. made sure that the therapist had executed a nondisclosure agreement so the therapist could not share anything with J.P.'s parents, and J.P. emphasized to the therapist that he did not want any information from his sessions shared with anyone. J.P. discussed the sexual abuse in that first session. After a few sessions, the therapist suggested that a pedophile will move on from one victim to another, and it was likely that defendant would move to abuse his own children. After learning this, J.P. arranged to have a therapy session with his parents and to reveal to them defendant's sexual abuse. After the family session, law enforcement was contacted.

¶ 30    J.P. testified that he was interviewed by the police, and this led to a search of the Lake Forest residence. Police recovered the red fleece pajamas with penguins, pink shorts, and navy-blue shorts from the residence. The black vibrator was not located, but a white vibrator was recovered from a closet. Police also recovered a laptop computer.

¶ 31    J.P. was extensively questioned about defendant's penis and was shown three photographs during his testimony. The photographs had been prepared by defendant and were turned over to the State during discovery. On August 28, 2019, well before the trial commenced, defendant filed a motion *in limine* to preclude the use of the photographs and the identification of defendant's penis, arguing that the pretrial display of the photographs (the two closeups of defendant's penis) to J.P. constituted an impermissibly suggestive show-up identification. Lakesha Wilkerson, a detective with the Lake County sheriff, testified during the motion *in limine* hearing that she

showed J.P. the photographs. Specifically, she did not inform J.P. what the photographs depicted, only that they were "graphic." Wilkerson showed J.P. the first two photographs, and J.P. immediately identified them as defendant's penis. When J.P. was asked how he identified the penis, Wilkerson recalled that J.P. replied that he had seen it before. With the second closeup photograph, J.P. explained that he had seen defendant's penis before, and recognized defendant's pubic hair. In its ruling on the motion *in limine*, the trial court noted that, because J.P. had not been informed of the subject matter or other details concerning the photographs, the procedure was not unduly suggestive, and the photographs were admissible with any issues going to the weight to be accorded them.

¶ 32    During his testimony at trial, J.P. viewed and identified all three photographs of defendant's penis in open court.[1] In each of the photographs, defendant's flaccid penis was held by an unseen individual wearing blue gloves. In the first photograph, a closeup of defendant's penis, one blue-gloved hand is holding the penis away from defendant's body. The hand is grasping the penis from above with the thumb closest to the viewer and the fingers contacting the opposite side of the shaft. Wrinkles of flesh covering the top of the glans and extending about halfway around the glans are apparent. The second photograph presents a closeup of defendant's penis with two blue-gloved hands manipulating defendant's penis to present its underside, again holding it away from defendant's body. The penis is twisted sufficiently to show the underside

---

[1]The photographs used by the State and shown to J.P. during his direct examination were not included in the record. These same photographs appear as defense exhibits and the State acknowledged that its photographs were copies of the defense exhibits.

with the holder's left hand grasping opposite sides of the shaft, thumb on the top, and fingers on the bottom, and the holder's right hand grasping the tip of the penis, thumb on the top and index finger on the bottom. The urethral opening is difficult to discern, but it appears to be visible on the underside of the penis, about two-thirds of the way towards the tip. The third photograph shows defendant's face in profile. Defendant's penis is held away from his body by a blue-gloved hand, thumb on top of the shaft at its base, the fingers below, holding the penis away from defendant's body. This appears to be a similar view as the first photograph, but from farther away. The wrinkles of flesh on the top of the glans are again apparent, but it is not clear how far they extend around the glans in this photograph. J.P. testified that the State had previously shown him these photographs and once again identified the pictures as depicting defendant's penis.

¶ 33    J.P testified that, because the sexual activity with defendant usually occurred in the dark, he had not observed defendant's penis as well-lit as it was depicted in the photographs. J.P. also noted that, in the second photograph showing the underside of defendant's penis, no foreskin was observable, but in the other two photographs, the foreskin was visible. When defendant's penis was erect, it looked much the same, larger with "the tip [being] a little bit more exposed." Describing the difference between when defendant's penis was flaccid and when it was erect, J.P. observed that "the foreskin went over the penis a little bit more [when it was flaccid] so you would see like a small part of the head, and then [when it was erect, the foreskin] would fold back, and you would be able to see the whole tip [of the penis] exposed."[2] J.P. was unaware of defendant's hypospadias, and J.P. did not ask defendant about his penis.

---

[2]J.P. also testified that he, like defendant, was not circumcised and observed that

¶ 34    Agnes testified that, after divorcing J.P.'s father, she entered a romantic relationship with defendant.  Defendant became a father figure to J.P., playing with J.P., giving him gifts, talking with him, disciplining him, and caretaking when Agnes was at work.  In approximately 2007, defendant moved in with Agnes and J.P. in the Lake Forest residence.  Defendant and Agnes had two children together, both conceived naturally, and the pregnancies and births provoked a stormier relationship.  When Agnes became pregnant with defendant's first child, he moved out for about four months, but defendant returned after the birth.  After the second child was born, the relationship further deteriorated.

¶ 35    Agnes testified that defendant is uncircumcised and had no issues gaining an erection or ejaculating.  Agnes was unaware of any conditions relating to defendant's penis.  While noting that she never looked, she also did not observe anything unusual about defendant's penis beyond it "curv[ing] a little bit to one side."  Agnes was shown the same three photographs and identified them to be of defendant's penis.

¶ 36    Agnes testified that she observed defendant watching pornography on his laptop.  She noted that defendant had other HP laptops before the one that the police recovered and was admitted at trial.  In addition to defendant, who would use the computer to watch pornography as well as to complete work-related invoices, she and J.P. also occasionally used the computer.  J.P. used the computer to watch things and had written some school papers on it.

¶ 37    Agnes testified that, after his junior year in high school, J.P. moved out of the Lake Forest residence to live with his father.  In 2018, after a Florida vacation with family and friends, Agnes

_____

defendant's penis looked different when erect than his.

thought J.P. appeared sad. J.P. asked her if he could see a therapist. Agnes surreptitiously recorded a therapy session between J.P., her, and J.P.'s father, after which they went to the police and the investigation into defendant's conduct was initiated.

¶ 38 Carol Gudbrandson, a computer forensic analyst with the Lake County state's attorney's office, testified that she completed a forensic analysis of the HP laptop computer recovered from the Lake Forest residence. There were many searches for videos and pictures depicting oral sex. In addition, many of the searches were close in time to searches about construction equipment and techniques defendant used in his work. Gudbrandson could not attribute any of the searches to any individual in the household. Gudbrandson also found evidence that J.P. had used the laptop for schoolwork. In addition, J.P. had represented that the laptop recovered was the same as the one on which defendant first showed him a pornographic video. However, Gudbrandson testified that the laptop was first registered and first used in 2011, several years after the first incident about which J.P. testified.

¶ 39 Defendant's younger brother, Marcin Dzierzanowski, testified on defendant's behalf. When they were both children, Marcin and defendant would bathe together, and Marcin observed defendant's penis. When Marcin was 5-6 years old, and defendant was 10-11 years old, the two were swimming in the river and Marcin observed defendant urinate. Marcin observed that the urine stream did not go straight, instead, it went down. Marcin did not see defendant have an erection or ejaculate, and the last time he saw defendant's penis was when they were children and before defendant had gone through puberty.

¶ 40 Dr. J. David Burstein, a urologist, testified as an expert witness on defendant's behalf. Burstein was retained because one of defendant's attorneys was friends with him and asked him

to examine defendant's penis. On April 21, 2019, Burstein examined defendant's penis at the Lake County jail. During the examination, Burstein did not observe defendant urinate, ejaculate, or have an erection. Based on the examination, Burstein determined that defendant had congenital distal hypospadias with chordee. Burstein explained the terminology meant that defendant's urethral opening was on the underside of his penis and was located closer to the glans than to the scrotum, and there was a curve in the head of the penis.

¶ 41    Burstein identified the three photographs of defendant's penis as those taken by defendant's attorneys during the examination. Burstein further explained that defendant is uncircumcised, but his foreskin is incomplete. The head of defendant's penis is curved, not the entirety of his penis. Burstein was not advised that defendant had any difficulties in obtaining erections, engaging in sexual relations, urinating, or ejaculating. In order to document the abnormality of defendant's penis, Burstein had to manipulate defendant's penis, and the attorneys took the photographs. Burstein testified that an observer would not be able to identify any distinguishing characteristics looking straight at defendant's penis without it being held and manipulated. In order to create the photograph showing the underside of defendant's penis, Burstein had to rotate it; however, if defendant's penis had not been rotated, the photograph of the underside of defendant's penis would not represent how it would have appeared.

¶ 42    At the close of the State's case, defendant moved for a directed finding on all counts. The trial court granted defendant's motion regarding two counts based on defendant placing his penis in J.P.'s anus (counts VI and XIV).

¶ 43    At the close of the trial, the trial court rendered its judgment. The court thoroughly recounted the evidence that had been adduced during the trial. In recounting J.P.'s testimony, the court noted that J.P.:

"specifically described the defendant's penis. He said it was different. [J.P.] said he never talked to [defendant] about why it was different. [J.P.] said that [defendant's] penis, the skin would pull back when it was erect. When it was flaccid, the foreskin was over the penis, although he did say in his testimony that the defendant never had trouble ejaculating."

¶ 44    The court also recounted inconsistencies in J.P.'s testimony. Specifically, the court noted that J.P. was questioned about being beaten with a belt and testified that he did not remember whether his brother was present, but, in his police interview that initiated this case, J.P. had affirmatively stated that his brother was in the room as he was being struck with a belt.

¶ 45    The trial court also discussed the forensic investigation of the laptop. The court recounted that Gudbrandson testified that artifacts began to appear on the laptop in November 2011, which was "between the time period when [J.P.] was seven and 11 years old." In addition, pornography was found on the laptop, particularly pornography depicting acts of oral sex. The court recounted that the laptop also contained searches for construction equipment, and defendant worked in construction. As well, there was evidence that the laptop accessed pages from J.P.'s school.

¶ 46    The trial court recounted the testimony concerning defendant's penis. It noted that Agnes had not been aware of any abnormality with defendant's penis, and she had indicated that defendant never had issues with gaining an erection or with ejaculating, as their two children had been conceived naturally. The court recounted the testimony of defendant's brother, who noticed

that defendant's penis and urination was abnormal based on 38-year-old observations. The court further recounted Burstein's testimony, noting that it was consistent with J.P.'s testimony regarding how "the head would pop through the foreskin."

¶ 47    Following this discussion, the trial court determined that each of the remaining counts had been proved beyond a reasonable doubt. The court entered convictions on counts I-V and VII-XIII.

¶ 48    On July 9, 2021, defendant filed a posttrial motion. On August 23, 2021, the trial court denied the posttrial motion, and defendant was sentenced to a 39-year aggregate term of imprisonment. On September 8, 2021, defendant filed a motion to reconsider sentence, and, on September 14, 2021, the court denied defendant's motion. Defendant timely appeals.

¶ 49                                II. ANALYSIS

¶ 50    On appeal, defendant first challenges the sufficiency of the evidence regarding all his convictions. Next, defendant also challenges the trial court's ruling regarding J.P.'s delayed outcry about the sexual abuse. Third, defendant contends that the trial court improperly quashed his subpoena for J.P.'s school and medical records, also incorporating a claim that the indictment was insufficient within this contention. Fourth, defendant argues that the trial court improperly limited his cross-examination of Agnes regarding certain issues. Last, defendant argues that J.P.'s identification of defendant's penis was due to an improperly suggestive show-up. We consider each issue in turn.

¶ 51                        A. Preliminary Considerations

¶ 52    As an initial matter, we note that the State complains that defendant's statement of facts so woefully fails to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), that it

should be stricken. The State filed a motion to strike defendant's brief, and, on March 29, 2022, we denied the motion. In the State's response brief, the State again raises the same claims of noncompliance. The State outlines instances of outright argument, instances where the facts are improperly and misleadingly juxtaposed in the service of defendant's arguments, and instances where defendant failed to properly cite to the record on appeal to support his factual assertion. The harsh remedy of striking a brief is appropriate only where the noncompliance significantly hinders our review. *People v. Zarbock*, 2022 IL App (2d) 210238, ¶ 30; see also Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (the statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal"). We conclude that the deficiencies in defendant's statement of facts do not significantly hinder our review of the issues on appeal. Accordingly, we will not consider any noncompliant portions of defendant's statement of facts. *Zarbock*, 2022 IL App (2d) 210238, ¶ 30. We also admonish counsel to hew to the rule and to provide this court with a full, fair, and nonargumentative account of the relevant proceedings in accord with Rule 341(h)(6) in any future briefs. *Id.*

¶ 53                    B. Sufficiency of the Evidence

¶ 54    Defendant first argues on appeal that the evidence was insufficient to prove him guilty of all the offenses beyond a reasonable doubt. However, we note that defendant does *not* argue that the State failed to prove him guilty of a specific element of a specific offense. Instead, defendant's argument is directed at the overall sufficiency of the evidence. Specifically, defendant argues his "conviction[s were] based solely on the testimony of a single witness," namely, J.P. Defendant argues that J.P.'s testimony was incredible, and that it was impeached and contradicted.

¶ 55     When a defendant challenges the sufficiency of the evidence, the question the reviewing court must answer is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Aljohani*, 2022 IL 127037, ¶ 66.  The trier of fact bears the responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences arising from the evidence. *Id.*  This standard applies whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *Id.*  In performing our review under this standard, we will not retry the defendant or substitute our judgment for that of the trier of fact. *Id.* ¶ 67.  All reasonable inferences will be drawn in favor of a finding of guilt. *Id.*  A defendant's conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*  This standard of review applies equally to review of a bench trial and to review of a jury trial. *Id.*

¶ 56     J.P. testified that his first sexual encounter with defendant began with defendant inducing him to view pornographic material.  As he and defendant watched, defendant guided J.P. to begin manually stimulating defendant's penis.  At some point, defendant then guided J.P. to begin performing oral sex.  J.P. testified that, between the ages of 7 and 12, that was the typical pattern a sexual encounter would take.  Defendant and he would begin watching pornography together, J.P. would provide manual stimulation to defendant, and then the encounter would culminate with oral sex.  As J.P. aged, the encounters grew more intense, with defendant attempting to fit the entire length of his penis into J.P.'s mouth on occasion.  In addition, the location sometimes moved into the basement shower, but it still followed the pattern of manual stimulation culminating with

oral sex. J.P. very clearly testified that the violence he experienced from defendant was not related to the sexual encounters, rather, it was defendant's attempts at disciplining J.P. that led to corporal violence—the sexual encounters were intended to provide defendant with sexual gratification.

¶ 57    J.P. testified that he viewed pornography with defendant consistently on defendant's laptop, a Hewlett-Packard model. Gudbrandson testified that she conducted a forensic analysis of defendant's laptop. The analysis revealed that many searches for pornographic material occurred within a short time of searches for construction equipment. Defendant worked in the construction industry, and the searches for equipment appear to be consistent with the types of equipment that defendant could have employed. J.P. also testified that defendant would sometimes wear his mother's pink shorts and other times wear dark-colored shorts as part of the pattern the sexual encounters followed. These shorts were recovered during the police search of the Lake Forest residence: a pair of pink shorts belonging to Agnes and a pair of dark blue shorts belonging to defendant.

¶ 58    Agnes testified that she observed defendant watching pornography on a consistent basis. She testified that defendant began to discipline J.P. more vigorously as J.P. aged. She also testified that her work required her to be absent from the residence on the weekends because she was a wedding photographer. Agnes would leave defendant to take care of J.P. in her absence.

¶ 59    This testimony is sufficient to support defendant's convictions. See *People v. Sauls*, 2022 IL 127732, ¶ 52 (the positive, credible testimony of a single witness is sufficient to convict a defendant). Here, most of the substantive testimony was provided by J.P., and the testimony was consistent and eminently plausible. His testimony was corroborated by Gudbrandson's analysis

of defendant's laptop and by Agnes's testimony concerning the collateral issues of defendant's discipline and her work schedule.

¶ 60 Defendant argues that his convictions were based solely on J.P.'s testimony. Defendant essentially reasons that, on appeal, his convictions will rise or fall on J.P.'s testimony, and defendant attacks J.P.'s credibility. However, defendant's argument is simply a request that we reweigh the evidence, redraw evidentiary inferences, make our own credibility determinations, and reconsider and resolve anew the conflicts in J.P.'s testimony. This we may not do. *Id.* ¶¶ 66-67.

¶ 61 Defendant begins with the unobjectionable observation that J.P.'s testimony was not corroborated by another eyewitness and was not supported by physical evidence. While it is true that no other eyewitness observed defendant's sexual encounters with J.P., J.P. testified that the encounters took place when no one else was present. Thus, the lack of eyewitness corroboration of familial sexual abuse, by itself, is unsurprising and does not diminish J.P.'s testimony.

¶ 62 However, defendant's contention that there was no corroborating physical evidence of sexual abuse is less clear-cut than the eyewitness-corroboration contention. It is true that the State did not present records documenting physical injury to J.P. during the time period corresponding to the allegations of sexual abuse. Nevertheless, this fact is not nearly as damning to the State's case as defendant represents. J.P. consistently described the sexual encounters as beginning with the viewing of a pornographic video, progressing to J.P. being guided to manually stimulate defendant, and culminating with J.P. performing oral sex on defendant. Physical injuries would not be expected from J.P.'s description of the sexual encounters. Even when, according to J.P., the encounters grew more "intense," J.P. did not testify that the sexual encounters grew violent. The violence J.P. described occurred during defendant's efforts to discipline J.P.; the sexual

encounters remained nonviolent because the purpose, according to J.P.'s testimony, was defendant's sexual gratification. Thus, the lack of evidence of physical injuries to J.P. is consistent with J.P.'s testimony and is not unexpected.

¶ 63    In any event, we note that the State also presented documentary evidence that supported and corroborated J.P.'s testimony. Gudbrandson testified that numerous searches for construction equipment occurred within a short time of searches for pornographic material. Gudbrandson's testimony and the digital evidence she presented gives rise to the reasonable inference that defendant himself conducted the searches because the construction equipment would have been useful to defendant in his professional life. The record thus contains objective physical evidence tending to corroborate J.P.'s testimony.

¶ 64    Defendant cites several cases, presumably to illustrate the necessity of corroborating evidence for a determination that the evidence was sufficient. Two of the cases, *People v. Tawfeeq*, 2020 IL App (2d) 200052-U, and *People v. Geronimo-Ocampo*, 2019 IL App (1st) 182633-U, were entered before January 1, 2021, and are inappropriate to cite as even persuasive authority. Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1. 2021) (only Rule 23 orders entered on or after January 1, 2021, may be routinely cited as persuasive authority). We thus do not consider them. *Id.* We admonish counsel to carefully follow our supreme court's rules.

¶ 65    Defendant cites *People v. Madison*, 2021 IL App (1st) 182633-U, ¶ 40, for the proposition that the victim sustained physical injuries, thereby corroborating her account of a forcible sexual assault. *Madison* is distinguishable, however, because it involved a one-time attack by someone who was not a member of the victim's household; here, by contrast, defendant was a father-figure to J.P., and the sexual encounters spanned many years. Moreover, the lack of physical injury

where none would be expected from the description of the sexual encounters is not troubling. As J.P. described, the manual and oral sexual activity with defendant would not be expected to produce injuries and, indeed, no evidence of injuries was presented. We also note that corroborating evidence, such as Gudbrandson's testimony, was adduced, supporting J.P.'s account of the abuse.

¶ 66 Defendant argues that J.P.'s "testimony was impeached, contradicted, and incredible." To illustrate the contention, defendant first focuses on J.P.'s testimony about the laptop seized from the Lake Forest residence. J.P. testified that the Hewlett-Packard laptop that was seized was also the same laptop used during his initial sexual encounter with defendant. This testimony was affirmatively contradicted by Gudbrandson's analysis, which demonstrated that the computer was first used in 2011, years after J.P.'s first sexual encounter. Defendant concludes that, because the laptop cannot be the same as the one that was used during the first encounter, J.P.'s testimony was false and incredible. Defendant ignores the testimony that he used Hewlett-Packard laptops consistently throughout the time period of the abuse. J.P. was also around seven years old when defendant initiated their first sexual encounter and was unlikely to recognize or remark on defendant's decision to replace his computer. Instead, J.P., reasonably for a child of relatively tender years, focused on the make of the laptop and not defendant's habits concerning refreshing his personal technology. In short, the evidence shows that defendant's choice of laptop manufacturer remained consistent, and J.P.'s "verifiably false" testimony is collateral and immaterial.

¶ 67 Defendant further contends that J.P.'s testimony regarding the laptop "alone raises reasonable doubt." We disagree. As noted above, the specific computer used is a collateral issue—

the material testimony indicated that that defendant typically initiated a sexual encounter by playing pornography on his laptop, and the evidence amply supports the inference that defendant used his laptop extensively to play pornographic material.

¶ 68    Defendant cites *People v. Schott*, 145 Ill. 2d 188, 207-09 (1991), for the proposition that where the child-victim's testimony is the sole basis for the conviction, and it is extensively impeached and contradicted, a court will not hesitate to find that the evidence is insufficient.  In *Schott*, the child-complainant was a self-admitted liar, her trial testimony was impeached from numerous sources, including previous testimony in other proceedings, and various material and conflicting statements she made to a case worker and four police officers. *Id.*  Defendant invokes *Schott* for J.P.'s incorrect, but immaterial, testimony about his laptop.  The analogy is inapt. *Schott* stands at the far end of the spectrum, where the witness has been caught in repeated contradictions and errors in her testimony.  Here, J.P. testified that defendant introduced him to pornography on his Hewlett-Packard laptop and erroneously believed it had not been updated since the time of his first sexual encounter with defendant.  While J.P.'s assertion that the laptop seized from the Lake Forest residence was the same machine on which defendant first introduced him to pornography is unequivocally incorrect, it does not rise to the level of inconsistency, falsehood, and contradiction as *Schott*.

¶ 69    Defendant also cites *People v. Dailey*, 196 Ill. App. 3d 807, 813 (1990), to similar effect.  In *Dailey*, the complainant's testimony about her conduct was contrary to human experience.  For example, she claimed that defendant had held a gun on her, yet she continued to babysit for defendant for months after the incident. *Id.*  Here, by contrast, J.P.'s testimony was not contrary to human experience; instead, it jibes with reason and human experience, because it is not

surprising a child would not remember when or whether an old laptop was discarded and a new one took its place. *Dailey* is inapposite.

¶ 70    Defendant next argues, essentially, that it beggars the imagination that J.P. and Agnes did not notice the congenital defect of defendant's penis. While this is a serious issue in the State's proof, we disagree with defendant's contention.

¶ 71    The trial court, as trier of fact, heard the testimony of the relevant witnesses: J.P., Agnes, Marcin (defendant's brother), and Burstein. The court also observed the photographs of defendant's penis. In rendering its decision, the court expressly noted that J.P. "specifically described the defendant's penis. [J.P.] said it was different," but had never talked with defendant about his penis. J.P. also testified that "defendant never had trouble ejaculating." Regarding Agnes's testimony, the court noted that she was not aware of any condition affecting defendant's penis. She did not notice any abnormality when it was flaccid, and she noticed that it curved a little when it was erect but no other abnormality. The court further recounted that Agnes had testified that "defendant never had an issue with [obtaining] an erection or with ejaculation," and Agnes's and defendant's two children were conceived naturally. Thus, the court was fully cognizant of both the testimony and its import in rendering its decision.

¶ 72    We also observe that, according to the evidence adduced at trial, defendant was J.P.'s father figure and began sexual encounters with J.P. when J.P. was very young. J.P. would have seen very few, if any, adult penises to compare with defendant's, and defendant's penis would have been, simply, defendant's penis. Burstein testified that, in its flaccid state viewed from the front, defendant's penis would exhibit an incomplete foreskin. It was only when rotated for examination, that any abnormalities could be observed. J.P. was by no means a trained observer. He generally

observed defendant's penis in darkened or dim lighting, and, even in the bathroom shower sexual encounters, was probably not looking at defendant's penis with a clinician's eye. Nevertheless, in J.P.'s untrained experience, he was able to observe that defendant's penis was different, he testified it was different, and the trial court expressly noted that testimony in rendering its judgment. Accordingly, the record does not support defendant's contention that J.P. failed to observe that defendant's penis exhibited any abnormalities.

¶ 73    Defendant quotes a colloquy between J.P. and defense counsel in which, on cross-examination, J.P. agreed that defendant urinated or ejaculated out of a hole on the tip of his penis. We have reviewed all the testimony, including the exchange highlighted by defendant. The questioning is not necessarily as precise and unambiguous as defendant represents it to be on appeal. In J.P.'s descriptions of the sexual encounters, defendant always ejaculated into his mouth, something J.P. could not have viewed. Thus, the questioning on cross-examination assumes facts never testified to and is, frankly, at odds with the evidence given. Moreover, the testimony regarding the encounters in the shower indicated that defendant would bring J.P. into the bathroom and shower for the purpose of consummating a sexual encounter, not to watch defendant urinate. Thus, while J.P. was undoubtedly incorrect about having observed defendant urinate and ejaculate from a nonexistent opening in the glans of his penis, he was responding to defense counsel's leading questions, and those questions were themselves at odds with the testimony J.P. had already delivered concerning the various types of sexual encounters in which defendant engaged J.P. The trial court could properly account for this in considering the weight to give J.P.'s testimony as a whole, and it is clear that his mistake, contrary to defendant's view, did not undermine J.P.'s credibility.

¶ 74    Defendant also recites testimony from Marcin and Burstein, the examining urologist, to bolster his interpretation of J.P.'s erroneous testimony about observing defendant urinate or ejaculate.  One problem with this comparison across the witnesses, however, is that Burstein did not observe defendant urinate or ejaculate, and Marcin observed defendant urinate once (according to his testimony) nearly 40 years before his testimony in this case when defendant was still prepubescent, and Marcin never observed defendant ejaculate.  Thus, neither Marcin nor Burstein testified about how it looked when defendant urinated or ejaculated as an adult.  Burstein's and Marcin's testimony undoubtedly establish that defendant has an abnormal penis, and that defendant has hypospadias.  However, the fact of the condition does not mean it will be obvious to an untrained observer (and here, nonetheless, J.P. testified that defendant's penis was different).

¶ 75    In short, defendant recites testimony (and ignores inconvenient testimony) that establishes that his penis is congenitally deformed with hypospadias but does not relate whether an untrained lay observer, either casually or in the midst of a sexual encounter, would notice any abnormality in defendant's penis.  We believe the trial court reasonably resolved any errors and inconsistencies in J.P.'s and Agnes's testimony regarding defendant's penis.

¶ 76    In support of his argument that J.P. should have noticed, defendant cites *People v. Yeargan*, 229 Ill. App. 3d 219, 230-34 (1992), for the proposition that J.P.'s failure to have articulated that defendant's penis lacked an opening on its tip despite alleging some 500 sexual encounters is contrary to the laws of human nature and experience.  In *Yeargan*, the complainant did not have a normal vaginal opening, and instead had a urethral opening which she used for instances of sexual intercourse—but in the prosecution, she alleged that she was forcibly raped, and this was belied by the lack of injury to her person.  *Id.* at 230-31.  The sequence of events was implausible in that

the complainant alleged she was followed by two strangers, she did not cry out or fight back when accosted, the attack occurred along a well-traveled and well-lit thoroughfare, and she followed the defendant back to the thoroughfare. *Id.* at 231-32. In addition, the evidence adduced—her clothing was not torn, her groceries had not spilled, her dog neither attacked the defendant nor ran free, she did not try to call for help or to escape, especially as the defendant did not use a weapon— undermined the complainant's account. *Id.* at 232-33. Further, the court found the complainant's description of the attack, while possible in theory, [was] inherently incredible in light of know human physical capabilities." *Id.* at 235. We also note that the *Yeargan* defendant testified that the encounter and sexual activity were consensual, and this testimony was consistent with the evidence. *Id.* The court held that the complainant's testimony was too thoroughly undermined by the shortcomings discussed to support the defendant's conviction. *Id.*

¶ 77    Defendant seeks to analogize the shortcomings in the *Yeargan* complainant's testimony to those of J.P. here. The comparison is inapt. J.P. testified that defendant's penis was different. He testified erroneously on cross-examination, agreeing to leading questions about seeing defendant ejaculate (the ejaculations, according to J.P., occurred during oral sex and defendant ejaculated into his mouth—a place J.P. most assuredly could not see) and urinate. However, this error is not close to the *Yeargan* complainant's inherently implausible testimony, which included that her clothing was forcibly removed but not damaged, that she was forcibly sexually assaulted by two men in a garage in a dark alley but did not exhibit any signs of physical abuse, that she did not spill the bag of groceries she was carrying, that her assailants ejaculated 5 times in 20 minutes but no seminal material was found on her person or clothing, and that, despite these claims, she afterward followed the defendant back to a bar before returning to the garage and only then walking

to a gas station to phone police. *Id.* at 231-35. Looking at J.P.'s testimony as a whole and in the light most favorable to the prosecution, as we must, we recognize that it is a weakness in the State's case that J.P. did not articulate that he observed a specific abnormality in defendant's penis, only that it was different. However, this shortcoming does not so undermine the prosecution's case as to leave us with a reasonable doubt. J.P. testified that defendant's initial sexual encounters were gentle and a bit tentative, capturing his attention with pornography and then getting J.P. to emulate the actions depicted in that pornography by gently guiding J.P.'s hand to defendant's penis, and then J.P.'s mouth onto defendant's penis. Once the routine had been established, defendant tried other positions, dressing himself in different ways, and ramping up the intensity of the encounter as J.P. aged. As testified to and described by J.P., defendant's conduct is not contrary to the laws of human nature and experience.

¶ 78    Defendant's contentions regarding J.P. moving into the basement nearer to his alleged abuser, failing to make an outcry, and lacking in unusual behavior are similarly unavailing. J.P.'s move appears to have been completed after the sexual encounters had stopped. His desire for a room of his own instead of one shared with his young brothers may have outweighed any remaining unease around defendant, especially after the sexual encounters had stopped. Failing to make an outcry is an all-too-common occurrence in cases involving sexual abuse performed by a parental figure. J.P. did eventually make an outcry, when a friend related her own experience with sexual abuse to J.P., and J.P.'s conduct here does not defy human nature and experience. Finally, defendant seems to conceive that the State's case presented a 24-hour, 7-day-a-week, years-long, nonstop sexual assault perpetrated by defendant on J.P. According to defendant, it is implausible that the sexual encounters remained secret, and no one noticed despite family members and

babysitters frequently visiting the Lake Forest residence over the course of the alleged sexual encounters. A total of 500 encounters over a 7-year period still averages around an encounter a week, which means the encounters could have easily been timed to avoid the presence of others in the Lake Forest residence. Unsurprisingly, J.P. testified that the encounters occurred when no one else was present in the house. Additionally, regarding defendant's contention that J.P.'s behavior never veered into the unusual, he overlooks two key considerations: the encounters began at a young age and influenced J.P.'s behaviors at a fundamental level. J.P. also admitted that he acted out increasingly as he aged. Defendant's contentions, therefore, are unavailing.

¶ 79    Defendant argues that, taken together, all the inconsistencies and errors in J.P.'s testimony render it unbelievable and incapable of supporting a finding of guilt beyond a reasonable doubt for each of his convictions. First, defendant cites *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001), in which the circumstantial evidence was scant and irremediably weakened when considered in light of the evidence supporting a not guilty finding. In our case, by contrast, J.P. testified affirmatively and consistently about the episodes of abuse. He described a consistent pattern defendant would follow, and his description of the evolving and increasing intensity over time was not inconsistent with human nature and experience. Against this testimony, defendant points to J.P.'s erroneous testimony in response to leading questions on cross-examination about having seen defendant ejaculate and urinate from the tip of his penis, but there was no testimony about what defendant's urination looked like as an adult, only what a younger brother remembered from when defendant was 10 years old (and the brother was five or six); moreover, defendant overlooks that J.P. did testify that defendant's penis appeared different, even if J.P. did not possess the medical terminology to correctly describe defendant's congenital condition. Defendant also questions the

fact that the abuse continued in secret despite family members and babysitters visiting the Lake Forest residence, but this overlooks defendant's design, as consistently testified to by J.P., to keep the abuse secret by initiating sexual encounters when no one else was present in the house. Defendant also questions some of J.P.'s behavior and decisions to move to a private basement bedroom nearer to defendant and farther from his mother when J.P. had previously testified he was frightened of defendant. J.P. testified, however, that defendant's violence arose in relation to discipline, not sexual encounters, and the move to the basement came at the end or after the sexual abuse had been discontinued, when it might nevertheless be reasonable for J.P. to seek privacy over sharing a room with his younger brothers. Unlike *Ortiz*, then, the evidence here was not nearly as flawed and weak, so *Ortiz* is inapposite.

¶ 80   Defendant also cites *People v. Stevenson*, 25 Ill. 2d 361, 365 (1962), apparently for the proposition that a reviewing court will sustain a conviction "only upon credible evidence that removes all reasonable doubt of guilt, and where the evidence of the prosecution is improbable, unconvincing or contrary to human experience, [the court] will not hesitate to reverse a judgment of conviction." We note, however, that *Stevenson* was decided well before the current standard of review was implemented (see, *e.g.*, *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (" 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (emphasis in original.)), and its use of an outmoded and incorrect standard of review undercuts any guidance it offers.

¶ 81   Finally, defendant cites *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007), and *People v. Manion*, 67 Ill. 2d 564, 578 (1977). In both cases, the court held that the defendant's challenge to

the sufficiency of the evidence failed. Thus, both cases are inapposite to defendant's position here because, in both, the court thoroughly reviewed the evidence and found it to be sufficient. We have done the same in this case. Accordingly, we hold that the evidence presented in this case was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt of the offenses of predatory criminal sexual assault of a child and aggravated criminal sexual abuse.

¶ 82                    C. Delayed Outcry—Hearsay Testimony

¶ 83    Defendant next contends that the trial court abused its discretion by allowing the State to introduce testimony about J.P.'s outcry because the statements were hearsay and inadmissible pursuant to a recognized hearsay exception, and the admission of the statements improperly bolstered J.P.'s testimony. Defendant does not clearly present either witness's purportedly objectionable testimony. Instead, defendant jumps between Agnes and J.P., blurring the lines between each witness's testimony, and attempts to attribute all testimony to the State. While the State may be responsible for the testimony in an abstract sense, such looseness with presentation does not assist this court in determining the merits of defendant's contention.

¶ 84    Defendant appears to challenge as hearsay J.P.'s first outcry to his friend, Olivia. J.P. testified that he told Olivia in March when they went to Florida together with their families during spring break. The prosecutor attempted to pinpoint the time, and defendant objected. The trial court overruled the objection, and J.P. testified that his outcry to Olivia occurred in March 2018. The defense apparently attempted to object again, and the court admonished defense counsel that whoever would be cross-examining J.P. was the only attorney eligible to object. J.P. stated that, in response to Olivia's revelation that something had happened to her, J.P. "ended up telling her

that the defendant had touched [him] sexually," without going into any details. The defense did not object to this question or response.

¶ 85    J.P. then testified that he told his therapist about defendant's abuse. J.P. explained that he made sure that the therapist would not be able to tell his parents anything he shared, and, when he was assured that the therapist would not inform anyone else, he immediately told her about defendant's abuse. After a "couple sessions," the therapist told J.P. "that pedophiles move on from one victim to another," and that, even though J.P. was not defendant's child, "[defendant] was going to move on to [his biological children]." This elicited an objection from the defense. The trial court overruled the objections, stating that it was not offered for the truth of the matter, "only why [J.P.] told and when he told," indicating that the court considered it to be a hearsay objection. The defense did not elaborate on its objection, and the court's ruling clearly indicated that it was not considering the testimony for the truth of the matter, but only for the nonhearsay reason of course of conduct.

¶ 86    J.P. then testified that he set up a family session to tell Agnes and his father, Thomas P. After telling them in the family session, J.P. believed one of his parents set up a meeting with the authorities, and J.P. described from his perspective how the investigation proceeded. The defense did not interpose an objection.

¶ 87    Agnes also testified about the Florida vacation. She first related the family and friends who had gone on the trip with her and J.P. Next, Agnes was asked if, after the trip, J.P. asked anything of her. Agnes responded, "Yes. It wasn't like—on the end of the trip, I remember J.P. being very sad, and he asked me if he can—." The defense objected at this point, and Agnes

finished her response, stating, "If he could go to therapy." The trial court overruled the objection. The prosecutor attempted to clarify the timing of J.P.'s request:

"Q [(Prosecutor)]. And he asked you this while you were still in Florida?

A [(Agnes)]. Yeah. We were sitting at the airport, and he was like very sad. And I asked him what's wrong, and like I start talking to him. And he just—I remember this. He just looked at me, and he said—

[DEFENSE COUNSEL]: Judge, objection.

[AGNES]: —I want to go to therapy.

THE COURT: Just a moment. It's not for the truth of the matter; however, in the testimony of [J.P.], he indicated that he had advised his mother he wanted to go to therapy, and the reason why. And this is not for the truth of it, but that this is what happened because she set this up."

¶ 88　　Agnes testified that she found J.P. a therapist and that J.P. "very quickly" began attending sessions. Agnes then testified that the therapist arranged a family therapy session with her, Thomas, and J.P. Agnes assumed the topic of the session would cover her and Thomas's inability to cooperate and get along after their divorce. The prosecutor asked, "what information did you receive from [J.P.]" during the family therapy session, and the defense objected. The following colloquy occurred:

"[PROSECUTOR]: Judge, same argument as before. It goes to the course of conduct. It goes to the next step. It goes to the information she was first disclosed by [J.P.], and then what happened next in the course of this case.

[DEFENSE COUNSEL]: Certainly this is an out-of-court statement by a nonparty

declarant for the truth asserted. They don't need to elicit hearsay in order to accomplish

that something was said and something was done.

THE COURT: Correct.

[DEFENSE COUNSEL]: It's hearsay.

THE COURT: Correct. You can ask her after the conversation, what did you do."

The trial court thus sustained defendant's objection to Agnes's testimony.

¶ 89    Defendant argues that the above testimony was improper hearsay offered for the purpose

of improperly bolstering J.P.'s testimony. The State contends that defendant forfeited the claimed

errors. First, the State argues that any error attributed to J.P.'s testimony about his outcry to Olivia

is forfeited because the defense did not make a contemporaneous specific objection. To preserve

a testimonial error, a defendant must ordinarily make a specific objection at trial and raise the

specific objection again in a posttrial motion. *People v. Brand*, 2021 IL 125945, ¶ 31. When a

defendant fails to satisfy either requirement, the claimed error is forfeited on appeal. *Id.*

¶ 90    In his appellate brief, defendant appears to first assign error to Agnes's testimony about

the circumstances of the trip to Florida. Defendant did not object to this testimony at trial. Any

challenge to Agnes's testimony about the circumstances of the Florida trip are therefore forfeited.

*Id.* The court allowed Agnes to testify that J.P. looked sad and wanted to engage in therapy,

overruling defendant's objection and specifically noting that it would consider Agnes's testimony

on that point to explain the course of conduct, not as substantive evidence. Defendant also assigns

error to Agnes's testimony about what happened in the therapy session. We note that the trial

court sustained defendant's hearsay objections to "what information did [Agnes] receive from

[J.P.]," and to the related answer "[J.P.] said he wants a therapy [session] with his parents." Thus, because the trial court sustained the timely objections to these portions of Agnes's testimony, no error could accrue.

¶ 91    Turning to J.P.'s testimony, defendant assigns error to his testimony that he told Olivia that defendant had touched him sexually. Defendant did not object to this specific testimony, either with a general or specific objection. Any claim of error arising from J.P.'s statement to Olivia, therefore, is forfeited under *Brand*. *Id.*

¶ 92    Defendant next assigns error to J.P.'s testimony about his therapy sessions. Defendant did not object to the preliminary testimony concerning J.P.'s desire not to share with his parents any information he related to the therapist. By not objecting to this preliminary testimony, defendant has forfeited his assignment of error to it. *Id.*

¶ 93    Next, defendant offered a general objection to J.P.'s testimony that the therapist told him that pedophiles move from one victim to another and warned J.P. that defendant would begin to abuse J.P.'s brothers. The trial court overruled this objection, reasoning it was for the nonhearsay purpose of demonstrating J.P.'s course of conduct. Defendant also included in his posttrial motion that "[J.P.'s] alleged outcries to [Olivia] and a therapist, and their responses [were] offered in an improper effort to bolster [J.P.'s] testimony." We conclude that defendant preserved his hearsay objection to this testimony.

¶ 94    Further, regarding the forfeited claims of error regarding J.P.'s and Agnes's testimony, defendant does not argue that they amount to plain error. Accordingly, as to the contentions we have deemed forfeited, we will not consider them further for plain error. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (forfeited issue may be considered as plain error, provided (1) the evidence

is closely balanced and the error could have tipped the result regardless of the error's seriousness, or (2) the error was so serious that it affected the fairness of the defendant's trial regardless of the closeness of the evidence.).

¶ 95    We thus turn to defendant's claim of error regarding J.P.'s testimony that his therapist told him that defendant would "move on" to his brothers.  Hearsay is an out of court statement offered to prove the truth of the matter asserted, and it is generally inadmissible.  *People v. Price*, 2021 IL App (4th) 190043, ¶ 137.  However, testimony is not barred by the rule against hearsay if it is not offered for its truth, but for some other purpose, such as to show the effect on the listener or to show the course of conduct.  *Id.*  We review the court's ruling on a hearsay objection for an abuse of discretion.  *Id.* ¶ 142.

¶ 96    Here, the trial court clearly overruled defendant's objection because it was considering the "move on J.P.'s brothers" testimony as nonhearsay, course-of-conduct testimony.  It could not have been offered for its truth because there was no evidence and no allegations that defendant, indeed, attempted to prey on J.P.'s brothers, his biological children.  Rather, the testimony was offered to show why J.P. decided to ask to include Agnes and his father in a family therapy session and to reveal his abuse at defendant's hands in that session.  We find no abuse of discretion.

¶ 97    Even if the "move on to J.P.'s brothers" testimony were erroneously admitted, defendant cannot demonstrate prejudice.  As an initial matter, because this was a bench trial, there is a rebuttable presumption that the trial court knows the law and considered only competent evidence for proper purposes in making a determination on the merits.  *People v. Jones*, 2017 IL App (1st) 143404, ¶ 36.  To rebut this presumption, the record must affirmatively show that the court actually used the evidence improperly as alleged.  *Id.*  Defendant does not show how the trial court

improperly used the evidence, and the record reveals that the trial court expressly stated it was considering the evidence only to understand "why [J.P.] told and when he told." Moreover, J.P. had directly testified about the sexual encounters to which defendant subjected him. The testimony about the therapist urging J.P. to tell his parents (and, presumably, to escalate the matter to the police) had no effect on the outcome of the trial in light of J.P.'s extensive and properly admitted testimony about the numerous episodes of abuse. Accordingly, any error accruing from the admission of this testimony is harmless beyond a reasonable doubt. *People v. Harris*, 2022 IL App (1st) 192509, ¶ 77 (the admission of hearsay evidence is harmless if there is no reasonable possibility that the result would have been different had the hearsay been excluded).

¶ 98    Defendant argues that J.P.'s statements did not qualify for substantive admission under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)). Defendant's argument, in light of our discussion above, is unavailing. The purported hearsay statement was allowed for the nonhearsay purpose of showing J.P.'s course of conduct, not for its truth.

¶ 99    Defendant also argues that the "move on to J.P.'s brothers" testimony was only a recitation of past events, and it was neither a prompt nor a spontaneous declaration of injury. Defendant reasons that that the testimony served to corroborate J.P.'s testimony concerning defendant's abuse. The "move on to J.P.'s brothers" testimony related the therapist's urging and rationale for J.P. to disclose the abuse to others. It does not serve to significantly corroborate or bolster J.P.'s testimony concerning defendant's abuse. We reject defendant's contention.

¶ 100   Defendant finally argues that the State failed to show the necessity of the "move on to J.P.'s brothers" testimony to show J.P.'s course of conduct. We rejected an extension of the necessity

requirement beyond that pertaining to police investigations. *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 86. We reject it here. More generally, however, testimony about why a victim reported the abuse and why an investigation was undertaken is proper. *People v. Byrd*, 43 Ill. App. 3d 735, 742-43 (1976). Defendant's contention is unavailing.

¶ 101                                    D. Medical and School Records

¶ 102   Defendant next argues that the trial court abused its discretion in quashing his subpoena to obtain J.P.'s medical and school records. Although defendant represents in his "nature of the case" section in his brief on appeal that "[n]o issues are raised on the pleadings," defendant charges that the indictment was fatally deficient because it did not identify with sufficient specificity the dates on which the offenses were alleged to have occurred. Defendant then argues that, regardless of the adequacy of the indictment, the trial court abused its discretion in quashing his subpoena. We first provide a background regarding defendant's subpoena for J.P.'s medical and school records, and then we consider defendant's arguments in turn.

¶ 103                                    1. Background for Subpoena

¶ 104   On February 1, 2019, defendant filed a motion to issue subpoenas to obtain J.P.'s medical and school records, along with any records pertaining to J.P. created by the Department of Children and Family Services (Department). Defendant specifically sought J.P.'s school records from ages 7 to 16 to determine if J.P. made any statements to school personnel about defendant and indicated that he believed the records would not contain any documentation of outcries or physical injuries despite the lengthy time period available for J.P. to have done so. Defendant sought J.P.'s medical records to confirm whether J.P. was ever treated for physical injuries that could have corroborated the allegations of abuse, or whether J.P. made any statements to medical personnel concerning the

allegations of abuse. Finally, defendant sought any records generated by the Department regarding J.P. and his family.

¶ 105 On February 15, 2019, the State filed a motion to quash defendant's subpoena for various records. The State argued, essentially, that defendant was attempting to embark on a fishing expedition to uncover "all school records and all medical records" bearing on the issue of J.P.'s credibility, and that such a request was unduly burdensome and largely irrelevant—effectively looking for ammunition to support a campaign to discredit J.P. at trial.

¶ 106 On March 1, 2019, following argument, the trial court entered its rulings on the State's motion to quash. The court allowed defendant to issue a records subpoena to the Department for J.P.'s records. The court also allowed defendant to issue a records subpoena to J.P.'s therapist for her records relating to J.P. from March 1, 2018, to June 1, 2018. The court granted, without prejudice, the State's motion to quash regarding J.P.'s medical records from Northwestern Lake Forest Hospital and unknown pediatricians, and the court granted the State's motion to quash regarding J.P.'s school records from the elementary and high schools J.P. attended.

¶ 107 Regarding the medical records, the trial court reasoned that, because the only physical injury the defense was aware of was a broken leg at school, the request for records extending over a 10-year period was neither sufficiently specific nor relevant. Regarding both the elementary and high school records, defendant sought the records to reveal any statements from J.P. to school personnel regarding physical abuse. The court reasoned that, because there were no allegations of physical abuse, the request for the school records was not relevant.

¶ 108                         2. Sufficiency of the Indictment

¶ 109 Defendant argues that the indictment in this case was fatally deficient because it did not allege with reasonable specificity the time frame during which the alleged offenses occurred. It is beyond dispute that a criminal defendant has the fundamental right, under both the federal and state constitutions, to be informed of the nature and cause of any criminal accusations made against him or her. *People v. Libricz*, 2022 IL 127757, ¶ 35. Section 111-3 of the Code (725 ILCS 5/111-3 (West 2020)) delineates this right and requires the charging instrument to be in writing, to state the name of the offense and the statutory provisions violated, to provide the nature of the offense, the elements of the offense, and the date and county in which the offense occurred, and to name or describe the accused. However, how we consider a challenge to the sufficiency of a charging instrument depends on the timing of the challenge. *Libricz*, 2022 IL 127757, ¶ 36. If the challenge is raised before trial in a pretrial motion, then the charging instrument must strictly comply with the requirements in section 111-3. *Id.* ¶ 37. If, as here, however, the sufficiency of the charging instrument is challenged for the first time on appeal, we employ a less stringent standard of review. *Id.* For the first-time-on-appeal challenge, the charging instrument need only apprise the accused of the precise offense charged with enough specificity to (1) allow the accused to prepare a defense, and (2) allow the accused to plead a resulting conviction as a bar to future prosecution arising out of the same conduct. *Id.* In other words, for such a challenge, the key consideration is whether the defect in the charging instrument prejudiced the defendant in preparing his or her defense. *Id.*

¶ 110 Before considering defendant's contention, we note that the State claims that, by not raising the deficiency of the indictment in the trial court, defendant has forfeited his challenge on appeal, citing *People v. Clark*, 30 Ill. 2d 67, 73 (1963) ("[t]echnical objections to an indictment cannot first be heard subsequent to trial, and having failed to raise this objection by an appropriate motion

in the trial court defendant must be deemed to have [forfeited] it"). *Clark*, however, refers expressly to "technical defects." See *People v. Walker*, 83 Ill. 2d 303, 313 (1980). We reject the State's waiver contention because defendant's challenge is not technical; instead, it raises concerns regarding his ability to adequately prepare a defense.

¶ 111 Defendant complains that the indictment charged him with nine counts of predatory criminal sexual assault of a child between a six-year period extending between January 2007 and November 2012, and six counts of aggravated criminal sexual abuse between a three-year period extending between November 2012 and December 2015. Defendant argues, conclusorily, that he was prejudiced because he could not "pin down the dates of the alleged actions to adequately prepare his defense," and the vagueness of the dates "exposed him to double jeopardy" because the "State could charge an additional act in the same period of time and leave no way for [defendant] to prove the new charge had previously been included in the instant indictment." We disagree.

¶ 112 To assess whether a defendant experienced prejudice from a charging instrument, the reviewing court must determine, after considering the record, whether the defects in the charging instrument prejudiced the defendant's ability to prepare a defense. *Libricz*, 2022 IL 127757, ¶ 38. If the reviewing court is unable to say that the defects in the charging instrument inhibited the defendant in the preparation of his or her defense, it cannot conclude that the defendant experienced prejudice. *Id.*

¶ 113 Here, defendant's ability to prepare a defense was not inhibited. At the hearing on the motion to quash, the defense acknowledged that it had received in discovery a recording of J.P.'s statements to the police at the outset of this case. In that recording, J.P. referred to specific

encounters with defendant as occurring when he was in a specific grade in school. In addition, defendant was aware that J.P. did not allege that this happened once or only a few times. Rather, defendant was aware that J.P. alleged that the sexual encounters occurred regularly throughout the entire time period alleged in the indictment, roughly on a weekly basis. Defendant did not (and likely could not) attempt to defend himself by saying he was not present. Rather, his defense was that the alleged encounters did not occur, that J.P. was lying. The indictment was not unduly vague, and, considering the facts presented in the record, defendant's ability to prepare a defense was not impeded.

¶ 114 Defendant also contends he could be subject to double jeopardy for the same offenses without any way to prove those offenses had not already been adjudicated. We disagree. J.P. certainly provided landmarks in his testimony, such as the first encounter, the second encounter, the first encounter in which defendant positioned J.P. a certain way, and so on. These landmarks are sufficient to prevent the same offense from being prosecuted again, so there is no double jeopardy concern. In addition, J.P. estimated that there were approximately 500 encounters. Aside from the described landmarks in J.P.'s testimony, the State still has a veritable untapped cornucopia of sexual offenses to choose from for any hypothetical future prosecution. We are confident that, should the details of any already-adjudicated encounters be repeated in any hypothetical future prosecution, defendant will be able to invoke the protection of double jeopardy. Based on the foregoing, we cannot say that defendant's ability to prepare a defense was impeded, and we hold he experienced no prejudice from the alleged defects in the indictment.

¶ 115 Defendant argues that he requested a bill of particulars requesting the "exact time and date of the occurrence," but that the "State did not provide anything more specific." The bill of

particulars was requested in defendant's May 7, 2019, motion for pretrial discovery. It does not appear to have been litigated. By filing the motion, it was incumbent upon defendant to litigate it, and the fact that he did not do so suggests that it was abandoned. *People v. Van Hee*, 305 Ill. App. 3d 333, 335 (1999) ("when no ruling has been made on a motion, the motion is presumed to have been abandoned absent circumstances indicating otherwise"). Thus, defendant cannot assign error to a motion he abandoned.

¶ 116 Defendant cites *People v. Guerrero*, 356 Ill. App. 3d 22, 27-28 (2005), for the implied proposition that an indefinite time period of longer than three years is too long for a charging instrument to bear scrutiny. Defendant, however, acknowledges that *Guerrero* held that, "[a]s long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Id.* at 27. Defendant also cites *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 31, for essentially the same proposition, this time involving a five-year span. Here, we have already determined that defendant's ability to mount a defense was not impeded by the vagueness of the dates for the alleged offenses. Defendant also received discovery, including J.P.'s statement to the investigators at the outset of the case, which contained specific descriptions and narrowed the occurrences to particular grades in school (a nine-month period). *Guerrero* and *Albarran* do not persuade us otherwise.

¶ 117 Defendant also attempts to argue that the offenses are too indistinguishable to prevent a hypothetical and overzealous future prosecution from running afoul of double jeopardy, citing cases that note the record of the prior prosecution can be reviewed to prevent just such an affront to a defendant's rights. *People v. Long*, 55 Ill. App. 3d 764, 773 (1977). We remain unpersuaded.

The record is sufficiently clear, and J.P.'s testimony contained sufficient landmarks to avoid double jeopardy in hypothetical future prosecutions.

¶ 118                                  3. Motion to Quash

¶ 119   Defendant argues that the trial court abused its discretion quashing portions of his request to subpoena records from the Department, J.P.'s medical providers, and J.P.'s schools.  Generally, a trial court's rulings on discovery are reviewed for an abuse of discretion.  *People v. Sauls*, 2022 IL 127732, ¶ 32.  Regarding records subpoenas specifically, the defendant has the right to compel production of documents, and this applies to discovery in criminal prosecutions.  *Id.* ¶ 33. However, a records subpoena is a judicial process controlled by the trial court.  *Id.*  The subpoenaed documents are sent directly to the court, which determines their relevancy and whether they are privileged, and whether the subpoena is unreasonable or oppressive.  *Id.*  In order to justify the issuance of a records subpoena, the requesting party must show: (1) the requested documents are evidentiary and relevant, (2) the documents cannot otherwise be reasonably procured through the exercise of due diligence ahead of trial, (3) the party cannot adequately prepare for trial without access to the documents, and without the documents, trial may be unreasonably delayed, and (4) the request for documents is made in good faith and is not intended to be a fishing expedition.  *Id.*

¶ 120   Defendant argues specifically that he wished to subpoena J.P.'s medical and school records because the records would have either provided observations of physical injuries tending to corroborate the allegations of abuse, or the records would lack such observations tending to controvert the allegations of abuse.  A primary flaw in defendant's argument is that he expected the records to lack observations of physical injury.  The allegations of J.P.'s abuse, however, did not describe activities that would be expected to result in physical injury.  Thus, the absence of

observations of physical injuries is inherently ambiguous and could support the allegations of abuse as well as could controvert the allegations of abuse.

¶ 121   Laying aside the logical issues, the State moved to quash defendant's request for records subpoenas primarily on the grounds that they were not relevant and were an improper fishing expedition.  Regarding the medical records, defendant argued generally that he was seeking to identify doctors and nurses who had examined J.P. during the relevant times because they were mandatory reporters obligated to observe any suspicious injuries.  Defendant reasoned that the records would either reveal suspicious injuries or would contain no reports of suspicious injuries, which would tend to undermine J.P.'s allegations of sexual abuse.  Defendant also identified an incident in which J.P. was treated for a broken leg that occurred at school.  Defendant argued that the physician or nurse who treated the broken leg would have examined J.P. and would have recorded his general observations, which would either confirm or deny the presence of suspicious injuries.  The trial court reasoned that the only specific information defendant offered to justify his records subpoena was the incident in which J.P. broke his leg at school, which was not relevant to any issue of sexual abuse.  The court reasoned that the other requests were neither specific enough nor relevant to justify the issuance of subpoenas for J.P.'s medical records.

¶ 122   We perceive no abuse of discretion.  The broken leg was not related to the allegations of abuse and was therefore not relevant. Defendant's contention that J.P.'s medical records may have contained observations of injuries was wholly speculative in light of the nature of the allegations of abuse—nonviolent manual and oral sexual encounters.  The trial court did not abuse its discretion quashing the request to subpoena J.P.'s medical records.

¶ 123    Likewise, defendant sought J.P.'s school records for the relevant times on the basis that he attended school every day, so the school personnel, also mandatory reporters, would have recorded observations of any suspicious injuries.  Defendant's argument in the trial court boiled down to, "Surely someone would have noticed."  Of course, this continued to fall afoul of the actual nature of the allegations of abuse—nonviolent manual and oral sexual encounters which would not have been expected to produce any physical injuries.  Because the allegations of abuse did not include allegations of physical abuse, the trial court determined that the elementary and high school records would not be relevant.

¶ 124    We again perceive no abuse of discretion.  The abuse alleged would not be expected to produce physical injuries.  Defendant all but admitted that he was embarked on a fishing expedition through the school records: arguing, for example, "*if* he has made statements to counselors or anyone," and "[*if*] there were any physical injuries on him."  (Emphases added.)  Again, defendant resorted to speculation and, because the allegations of abuse did not contain allegations of physical violence, no physical injuries would have been expected.  The trial court did not abuse its discretion quashing the request to subpoena J.P.'s school records.  Because the request to subpoena the challenged records was properly granted, we need not address further defendant's argument as to the remedy he should receive.

¶ 125                             E. Cross-Examination of Agnes

¶ 126    Defendant argues that the trial court erred in limiting his cross-examination of Agnes in two areas: first, defendant wished to cross-examine Agnes about whether she engaged in a sham marriage for the purpose of evading travel restrictions to visit her ill mother in Poland.  Second, defendant sought to cross-examine Agnes about surreptitiously recording the family therapy

session at which J.P. revealed his sexual abuse. Defendant argues that the proposed cross-examination touched on Agnes's credibility because it illustrated her willingness to lie.

¶ 127 A defendant has a sixth amendment right to confront witnesses through cross-examination. *People v. Moore*, 2016 IL App (1st) 133814, ¶ 50. Proper areas of inquiry are the witness's bias, prejudice, motive, and interest. *Id.* The trial court nevertheless possesses broad discretion to preclude improper cross-examination, keeping in mind that defendant's rights must be met before it moves to exercise its discretion. *People v. Prevo*, 302 Ill. App. 3d 1038, 1047 (1999). We first review *de novo* whether defendant's confrontation rights have been infringed and then whether the court's decision reveals an abuse of discretion. *Id.* at 1047-48. Even if the constitutional right has been infringed, we will not reverse the trial court if the error is harmless beyond a reasonable doubt. *Id.*

¶ 128 Defendant first sought to cross-examine Agnes about a sham marriage. Upon the State's objection, defendant admitted that he could not prove up his line of inquiry if Agnes denied being in a sham marriage. Defendant's proposed cross-examination on this topic was improper, because defendant had no means to show his inquiry, if denied by Agnes, had any validity. *Moore*, 2016 IL App (1st) 133814, ¶¶ 50-51. Defendant was, however, allowed to elicit from Agnes that she had married an individual, and they never lived together. In addition, defendant could have asked Agnes whether she traveled to Poland to visit her ill mother. Thus, defendant placed the information before the trial court from which he sought to draw the inference that Agnes was prone to dishonesty in the pursuit of her own agenda, and he was not prejudiced by the proper limitation on Agnes's cross-examination. Accordingly, the court did not abuse its discretion in prohibiting defendant from further cross-examining Agnes about her purported sham marriage.

¶ 129 Regarding the surreptitious recording, defendant asked whether Agnes had secretly recorded the session on her cell phone, the State objected, and the trial court sustained the objection. Defendant made an offer of proof, stating that Agnes recorded the family therapy session without the knowledge of the other participants and the defense could prove it by eliciting testimony from the therapist that she did not know Agnes was recording the session. Defendant argued to the trial court that the surreptitious recording constituted the offense of eavesdropping (720 ILCS 5/14-2(a)(2) (West 2020)), and, further, Agnes destroyed her copy of the recording after revealing its existence to the State. The State pointed out that defendant had copies of the recording, and defendant rejoined that the defense had only a truncated version of the recording, because the entirety of the original had been destroyed. The trial court observed that asking questions about destroying the tape could open the door for the recording to be admitted and to allow the court to determine whether portions had been edited. The court then allowed defendant to inquire of Agnes whether she recorded the family therapy session, whether she gave the recording to the State, and what she did with it after it was turned over.

¶ 130 Defendant posed those questions. Agnes admitted she recorded the session. Agnes testified that she retained the recording for "a couple years" before she notified the State that she had recorded it. Agnes testified that she turned the phone over to the State and, after some time, retrieved it from the State. Defendant asked what she had done with the recording, and Agnes testified she had done nothing with it, but she admitted that she was no longer in possession of the phone. Defendant did not seek to further pursue the line of questioning.

¶ 131 On appeal, defendant emphasizes his opinion that Agnes committed the offense of eavesdropping, and that her "willingness to break the law" was relevant to impeach her credibility.

We agree that the surreptitious recording of a therapy session (in possible violation of the law) reflects on Agnes's credibility. Defendant was allowed to ask questions that still bore on Agnes's credibility, such as whether Agnes had recorded the therapy session and whether she disposed of the recording. However, after being cautioned by the trial court that the line of inquiry could potentially open the door to admitting the recording itself, defendant apparently made the strategic decision not to pursue the cross-examination further. Nevertheless, defendant placed the information that Agnes had recorded the session, and that she had disposed of her phone containing the recording at some point after she turned it over to the State. From this, the court had most of the information defendant sought to elicit, and defendant would have been able to effectively attack Agnes's credibility.

¶ 132 Even though the trial court should not have precluded defendant's inquiry into whether the recording was surreptitious, defendant was able to elicit important information bearing on Agnes's credibility. Moreover, Agnes's testimony was largely collateral. It provided some corroboration to J.P.'s testimony, such as the physical nature of defendant's efforts at discipline, and his habits in frequently viewing pornography on his laptop. Defendant had obtained enough of the sham-marriage testimony to undercut Agnes's credibility, and, although defendant appears to have strategically limited his surreptitious-recording cross-examination to avoid admission of the recording itself, he was still able to demonstrate that Agnes was much less than forthright about it in her testimony and in her dealings with the State, all of which bore on her credibility. The trial court was well aware of the issues with Agnes's credibility, but, because of the largely collateral nature of Agnes's testimony, it would not have influenced the outcome of the trial. As such, any error was harmless beyond a reasonable doubt.

¶ 133                          F. Improper Show-Up Identification of Defendant's Penis

¶ 134   Defendant contends that the trial court abused its discretion in denying his motion *in limine* to bar J.P.'s in-court identification of defendant's penis because the identification resulted from an unduly suggestive pretrial photographic show-up.  Defendant argues that the State did not conduct a photographic array of several penises and instead showed J.P. a picture of only defendant's penis and asked him to identify it.  Defendant concludes that, "at the trial the State was permitted to identify the photographs as depictions of [defendant's] penis, thereby planting the suggestion that [J.P.] was able to identify the penis that had been handed to him and placed in his mouth."  (Citations omitted.)  We disagree.

¶ 135   As a preliminary matter, the State argues that defendant forfeited this issue because he did not make a contemporaneous objection to J.P.'s identification of the photographs at trial. Before trial, defendant filed a motion *in limine*, to preclude J.P. from providing an in-court identification of defendant's penis.  Defendant also included the show-up identification issue in his posttrial motion.  It is well settled that, in criminal cases, a defendant preserves an issue for review by (1) raising it in a motion *in limine* or a contemporaneous trial objection, and (2) raising it in a posttrial motion.  *People v. Denson*, 2014 IL 116231, ¶ 11.  Defendant followed that procedure here, raising J.P.'s identification in his motion *in limine* and raising the issue in his posttrial motion.  Defendant has not forfeited our review.

¶ 136   With that said, there is no issue regarding the identity of J.P.'s abuser.  Defendant created the photographs for the purpose of illustrating his congenital deformity of hypospadias.  According to the State, the photographs were shown to J.P. in preparation of trial after defendant had provided copies of the photographs in discovery.  The record shows that J.P. was not told what or who the

subject of photographs was, and that immediately upon seeing the first photograph, identified it as defendant's penis. When asked how he knew, J.P. replied that he had seen it before. The trial court ruled that the procedure was not unduly suggestive because J.P. was not informed of the subject of the photographs.

¶ 137 An identification will be deemed unreliable if the procedure used is unduly suggestive, and the identification resulting from the procedure is not independently reliable. *People v. Lacy*, 407 Ill. App. 3d 442, 459 (2011). Defendant argues that the photographs shown to J.P. were akin to a show-up identification. Defendant argues that the "show-up here was clearly unduly suggestive, as the State showed only photographs of Defendant's penis and took no steps to hide the fact." This argument is contradicted by the record. Wilkerson, the police officer who showed J.P. the photographs, testified that she told J.P. she would show him "graphic" photographs, but she did not reveal what or whom the photographs depicted. She also testified that J.P. immediately identified the photographs as depicting defendant's penis and, when asked how he knew, he indicated that he had seen it before. At trial, J.P. also testified that he recognized what was depicted in the photographs because he had seen it before. Accordingly, we reject defendant's contention that the procedure used for J.P. to view the photographs was unduly suggestive.

¶ 138 Moreover, defendant's argument ignores the reality of the circumstances presented in the record. J.P. lived with defendant for 10 years. He had seen defendant's penis on numerous occasions and, indeed, had engaged in some 500 sexual encounters with defendant by his estimation. J.P., therefore, was intimately familiar with defendant and defendant's penis. These facts are strongly supportive of the reliability of J.P.'s identification of defendant's penis independent of any methodology employed. See *id.* (to determine the reliability of an

identification, courts look to (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of any prior descriptions of the suspect by the witness, (4) the level of certainty by the witness at the time of the confrontation, (5) the length of time between the crime and the confrontation, and (6) any acquaintance with the suspect prior to the crime).

¶ 139 In any event, we conclude that any error accruing from showing J.P. the photographs of defendant's penis before trial was harmless beyond a reasonable doubt. See *People v. Patterson*, 217 Ill. 2d 407, 428 (2005) (error is harmless where it appears beyond a reasonable doubt that the error did not contribute to the verdict or finding). Identification is not an issue in this case— indeed, the purpose of the photographs was to demonstrate defendant's congenital hypospadias. Additionally, the evidence was not closely balanced. J.P. testified positively and credibly to some 500 occurrences over the course of years, and, despite defendant's contrary contentions, the testimony was corroborated and more than sufficient to prove defendant's guilt beyond a reasonable doubt. We conclude that the admission of J.P.'s identification of defendant's penis was harmless beyond a reasonable doubt.

¶ 140 Defendant argues that J.P.'s ability to identify defendant's penis bore strongly on his credibility. Defendant contends that, had J.P. not been tainted by the suggestive procedure, he could not have provided the lone corroboration of the identification of defendant's penis. We disagree. There was other corroborating evidence, including the pairs of shorts and pajamas that were recovered, and the evidence from defendant's laptop showing that searches for pornography were conducted within a few minutes of searches for construction equipment, as well as Agnes's testimony about defendant's disciplinary and pornography habits. Moreover, the record

demonstrates that, because of J.P.'s intimate acquaintance with defendant, even apart from the sexual abuse, any identification would likely have been reliable. Given the strong indicia of reliability in the identification notwithstanding the procedure used, there was no error in allowing J.P. to make an in-court identification of defendant's penis. Thus, J.P.'s credibility would not have been improperly enhanced, and defendant's contention fails.

¶ 141                                    III. CONCLUSION

¶ 142   For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 143   Affirmed.